## UNITED STEELWORKERS OF AMERICA *v.* UNITED STATES ET AL.

No. 504.   Argued November 3, 1959.—Decided November 7, 1959.

*Arthur J. Goldberg* argued the cause for petitioner. With him on the brief were *David E. Feller* and *Bernard Dunau.*

*Solicitor General Rankin* argued the cause for the United States. With him on the brief were *Attorney General Rogers, Assistant Attorney General Doub, Wayne G. Barnett, Samuel D. Slade, Seymour Farber* and *Herbert E. Morris*.

PER CURIAM.

The Attorney General sought and obtained in the District Court for the Western District of Pennsylvania an injunction against the continuation of an industry-wide strike of workers in the basic steel industry pursuant to § 208 of the Labor Management Relations Act, 1947, 61 Stat. 155, 29 U. S. C. § 178. We granted certiorari, *post,* p. 878, to review the judgment of the Court of Appeals for the Third Circuit, 271 F. 2d 676, affirming the District Court. In pertinent part, § 208 provides that if the District Court—

"finds that . . . [a] threatened or actual strike or lock-out—

"(i) affects an entire industry or a substantial part thereof engaged in trade, commerce, transportation, transmission, or communication among the several States or with foreign nations, or engaged in the production of goods for commerce; and

"(ii) if permitted to occur or to continue, will imperil the national health or safety, it shall have jurisdiction to enjoin any such strike or lock-out, or the continuing thereof, and to make such other orders as may be appropriate."

The arguments of the parties here and in the lower courts have addressed themselves in considerable part to the propriety of the District Court's exercising its equi-

table jurisdiction to enjoin the strike in question once the findings set forth above had been made. These arguments have ranged widely into broad issues of national labor policy, the availability of other remedies to the Executive, the effect of a labor injunction on the collective bargaining process, consideration of the conduct of the parties to the labor dispute in their negotiations, and conjecture as to the course of those negotiations in the future. We do not believe that Congress in passing the statute intended that the issuance of injunctions should depend upon judicial inquiries of this nature. Congress was not concerned with the merits of the parties' positions or the conduct of their negotiations. Its basic purpose seems to have been to see that vital production should be resumed or continued for a time while further efforts were made to settle the dispute. To carry out its purposes, Congress carefully surrounded the injunction proceedings with detailed procedural devices and limitations. The public report of a board of inquiry, the exercise of political and executive responsibility personally by the President in directing the commencement of injunction proceedings, the statutory provisions looking toward an adjustment of the dispute during the injunction's pendency, and the limited duration of the injunction, represent a congressional determination of policy factors involved in the difficult problem of national emergency strikes. This congressional determination of the policy factors is of course binding on the courts.

The statute imposes upon the courts the duty of finding, upon the evidence adduced, whether a strike or lockout meets the statutory conditions of breadth of involvement and peril to the national health or safety. We have accordingly reviewed the concurrent findings of the two lower courts. Petitioner here contests the findings that the continuation of the strike would imperil the national health and safety. The parties dispute the meaning of

the statutory term "national health"; the Government insists that the term comprehends the country's general well-being, its economic health; petitioner urges that simply the physical health of the citizenry is meant. We need not resolve this question, for we think the judgment below is amply supported on the ground that the strike imperils the national safety.\* Here we rely upon the evidence of the strike's effect on specific defense projects; we need not pass on the Government's contention that "national safety" in this context should be given a broader construction and application.

---

\*The evidence in this regard is reflected in the District Court's findings of fact Nos. 15 (a), (b), (c), and (d), as follows:

"(a) Certain items of steel required in top priority military missile programs of the United States are not made by any mill now operating, nor available from any inventory or from imports. Any further delay in resumption of steel production would result in an irretrievable loss of time in the supply of weapons systems essential to the national defense plans of the United States and its allies.

"(b) The planned program of space activities under the direction of the National Aeronautics and Space Administration has been delayed by the strike and will be further delayed if it is continued. Specifically, project MERCURY, the nation's manned satellite program, which has the highest national priority, has been delayed by reason of delay in construction of buildings essential to its operation. This program is important to the security of the nation. Other planned space programs will be delayed or threatened with delay by a continuation of the strike.

"(c) Nuclear Submarines and the naval shipbuilding program other than submarines, including new construction, modernization, and conversion, have been affected by reason of the inability to secure boilers, compressors, and other component parts requiring steel. Products of the steel industry are indispensable to the manufacture of such items and delay in their production will irreparably injure national defense and imperil the national safety.

"(d) Exported steel products are vital to the support of United States bases overseas and for the use of NATO allies and similar collective security groups. The steel strike, if permitted to continue, will seriously impair these programs, thus imperiling the national safety."

The petitioner suggests that a selective reopening of some of the steel mills would suffice to fulfill specific defense needs. The statute was designed to provide a public remedy in times of emergency; we cannot construe it to require that the United States either formulate a reorganization of the affected industry to satisfy its defense needs without the complete reopening of closed facilities, or demonstrate in court the unfeasibility of such a reorganization. There is no room in the statute for this requirement which the petitioner seeks to impose on the Government.

We are of opinion that the provision in question as applied here is not violative of the constitutional limitation prohibiting courts from exercising powers of a legislative or executive nature, powers not capable of being conferred upon a court exercising solely "the judicial power of the United States." *Keller* v. *Potomac Elec. Power Co.,* 261 U. S. 428; *Federal Radio Comm'n* v. *General Elec. Co.,* 281 U. S. 464. Petitioner contends that the statute is constitutionally invalid because it does not set up any standard of lawful or unlawful conduct on the part of labor or management. But the statute does recognize certain rights in the public to have unimpeded for a time production in industries vital to the national health or safety. It makes the United States the guardian of these rights in litigation. Cf. *United States* v. *American Bell Tel. Co.,* 128 U. S. 315, 370; *Sanitary District of Chicago* v. *United States,* 266 U. S. 405. The availability of relief, in the common judicial form of an injunction, depends on findings of fact, to be judicially made. Of the matters decided judicially, there is no review by other agencies of the Government. Cf. *Gordon* v. *United States,* 2 Wall. 561, 117 U. S. 697. We conclude that the statute entrusts the courts only with the determination of a "case or controversy," on which the judicial power can operate, not containing any ele-

44.

ment capable of only legislative or executive determination. We do not find that the termination of the injunction after a specified time, or the machinery established in an attempt to obtain a peaceful settlement of the underlying dispute during the injunction's pendency, detracts from this conclusion.

The result is that the judgment of the Court of Appeals for the Third Circuit, affirming that of the District Court, is affirmed. Our mandate shall issue forthwith.

*It is so ordered.*

MR. JUSTICE FRANKFURTER and MR. JUSTICE HARLAN: In joining the Court's opinion we note our intention to file in due course an amplification of our views upon the issues involved which could not be prepared within the time limitations imposed by the necessity of a prompt adjudication in this case.

Separate opinion of MR. JUSTICE FRANKFURTER and MR. JUSTICE HARLAN, concurring in the opinion of the Court dated November 7, 1959.

This action by the United States for an injunction under § 208 of the Labor Management Relations Act, 1947 (61 Stat. 155, 29 U. S. C. § 178) was commenced by the Attorney General at the direction of the President of the United States in the District Court for the Western District of Pennsylvania on October 20, 1959. The strike which was the concern of the action arose out of a labor dispute between petitioner, the collective bargaining agent of the workers, and the steel companies, and was nationwide in scope. The strike began on July 15, 1959, fifteen days after the contracts between the steel com-

panies and petitioner expired. On October 9, 1959, the President created the Board of Inquiry provided by §§ 206 and 207 of the Act to inquire into the issues involved in the dispute. The President deemed the strike to affect a "substantial part of . . . an industry," and concluded that, if allowed to continue, it would imperil the national "health and safety." On October 19 the Board submitted its report, which concluded: "[T]he parties have failed to reach an agreement and we see no prospects for an early cessation of the strike. The Board cannot point to any single issue of any consequence whatsoever upon which the parties are in agreement." The President filed the report with the Federal Mediation and Conciliation Service and made its contents public, in accordance with § 206, and ordered the Attorney General to commence this action, reiterating his former pronouncements that the continuance of the strike constituted a threat to the national health and safety.

Pursuant to stipulations of the parties, the District Court heard the case on affidavits. On October 21 it granted the injunction. Its order was stayed by the Court of Appeals for the Third Circuit, pending that court's final determination of petitioner's appeal. On October 27 it affirmed the decision of the District Court (one judge dissenting) and granted an additional stay to enable petitioner to seek relief here. On October 28 this Court denied the motion of the United States to modify the stay. On October 30 we granted certiorari, set the argument down for November 2, and extended the stay pending final disposition. In a *per curiam* opinion on November 7, this Court affirmed the decision of the Court of Appeals, MR. JUSTICE DOUGLAS dissenting. We noted our intention to set forth at a later time the grounds for our agreement with the Court's disposition and not delay announcement of the result until such a statement could be prepared.

The injunction was challenged on three grounds: (1) the lower courts were not entitled to find that the national emergency, upon which the District Court's jurisdiction is dependent under § 208, existed; (2) even if the emergency existed, the District Court failed to exercise the discretion, claimed to be open to it under § 208, whether or not to grant the relief sought by the United States; (3) even if the injunction was otherwise unassailable it should have been denied because § 208 seeks to charge the District Courts with a duty outside the scope of "judicial Power" exercisable under Art. III, § 2, of the Constitution.

Section 208 provides that the District Court "shall have jurisdiction to enjoin" a "threatened or actual strike or lock-out" if the court finds that it "(i) affects an entire industry or a substantial part thereof engaged in . . . commerce . . . or engaged in the production of goods for commerce; and (ii) if permitted to occur or to continue, will imperil the national health or safety . . . ." The District Court found, and it was not contested here, that the strike satisfied the first condition in that it affected a substantial portion of the steel industry. Petitioner urged, however, that the lower courts had no basis for concluding that it satisfied the second.

In its finding of fact No. 15, the District Court described four instances of serious impediment to national defense programs as a result of existing and prospective procurement problems due to the strike. The programs affected included the missile, nuclear submarine and naval shipbuilding, and space programs. Each of these findings had, as the Court of Appeals found, ample support in the affidavits submitted by the United States. According to the affidavit of Thomas S. Gates, Jr., Acting Secretary of Defense, delays in delivery of materials critical to the creation of the Atlas, Titan and Polaris missile systems had become so severe that each additional day of the strike

would result in an equal delay in project completion; and a "significant portion of the steel specified in the procurement contracts is of a composition not common to commercial usage nor available from existing civilian inventories by exercise of allocation or eminent domain powers of the Government. . . . [T]hese programs in many cases require special sizes and shapes, many of which can be fabricated only by firms having a long experience in their production and the necessary special facilities therefor. . . ."

The affidavit of Hugh L. Dryden, Deputy Administrator of the Aeronautics and Space Administration, stated, in some detail, that space projects, including tracking centers, rocket engine test stands, and other critical facilities, were, at the time of the hearing in the District Court, already subjected to delays of as much as seven weeks, with longer delays anticipated from the continuation of the strike. The affidavit of A. R. Luedecke, the General Manager of the Atomic Energy Commission, stated that minor delays in projects had, at the time of its making, already been experienced in critical programs of the Atomic Energy Commission, and that if the strike should continue into 1960 "there would be an appreciable effect upon the weapons program."

In view of such demonstrated unavailability of defense materials it is irrelevant that, as petitioner contended and the United States conceded, somewhat in excess of 15% of the steel industry remained unaffected by the stoppage, and that only about 1% of the gross steel product is ordinarily allocated to defense production.

However, petitioner also contested the sufficiency of the affidavits on the ground that they did not present the facts giving rise to the asserted emergencies with sufficient particularity to justify the findings made. This objection raises an issue which was essentially for the trier of fact, and the two lower courts found the affidavits sufficient.

It is not for the judiciary to canvass the competence of officers of cabinet rank, with responsibility only below that of the President for the matters to which they speak under oath, to express the opinions set forth in these affidavits. Findings based directly upon them surely cannot be said to be "clearly erroneous." Fed. Rules Civ. Proc., 52 (a).

Moreover, under § 208 the trier of these facts was called upon to make a judgment already twice made by the President of the United States: once when he convened the Board of Inquiry; and once when he directed the Attorney General to commence this action. His reasoned judgment was presumably based upon the facts we have summarized, and it is not for us to set aside findings consistent with them. The President's judgment is not controlling; § 208 makes it the court's duty to "find" the requisite jurisdictional fact for itself. But in the discharge of its duty a District Court would disregard reason not to give due weight to determinations previously made by the President, who is, after all, the ultimate constitutional executive repository for assuring the safety of the Nation, and upon whose judgment the invocation of the emergency provisions depends.

The petitioner next asserted that the findings made were insufficient as a matter of law to support the District Court's jurisdiction under § 208. Conceding that peril to the national defense is peril to the national safety, it asserted that the peril to the national safety which is made an element of the court's jurisdiction by part (ii) of § 208 (a) must result from the substantial character of the effect upon an industry required by part (i), and that if it does not so result a District Court is without power to enjoin the stoppage or any part of it. Alternatively, it urged that the jurisdiction which is conferred by the section is limited to relief against such part of the total stoppage as is found to be the cause in fact of the peril.

Petitioner claimed that as a matter of fact the procurement embarrassments found by the courts below were the result not of the entire steel stoppage or even of a substantial part of it, but only of the closing of a "handful" of the hundreds of plants affected; and that therefore the entire industry-wide strike should not have been enjoined under either construction of § 208 which it asserted.

In the first place, the requisite fact was found against petitioner's contention. The Court of Appeals found that "[t]he steel industry is too vast and too complicated to be segmented" so as to alleviate the existing and foreseeable peril to the national defense by the mere reopening of a few plants. It expressly relied upon the affidavit of Dr. Raymond J. Saulnier, Chairman of the Council of Economic Advisers of the Federal Government, which was before both the lower courts. Dr. Saulnier stated that:

> "Steel is produced through closely interrelated processes that often cannot be separated technically or economically to allow production of items 'needed' . . . while omitting items 'not needed.' . . . '[I]n order to satisfy defense requirements alone from the standpoint of size, grade, and product, it would be necessary to reactivate 25 to 30 hot rolling mills together with supporting blast furnaces, and Bessemer, electric, open hearth and vacuum-melting furnaces. Additional facilities for pickling, coating, heat treating, cold finishing, shearing, cutting, testing, and the like would also be required. To reopen these plants for the production of steel products to meet only defense requirements would be totally impracticable. The problems of scheduling the limited tonnages involved, plus the cost and technical difficulty of start-ups and shutdowns would appear to be insurmountable.' "

The lower courts had before them, as did this Court, the conflicting affidavit of Robert Nathan, the economist for the Steelworkers. But the trier of fact was not bound to prefer the arguments, however weighty, of petitioner's economist, however estimable, as against the views of the highest officers in the land and their economic advisers regarding the means for securing necessary defense materials.

Nor was it a refutation of the finding of the Court of Appeals to suggest, as petitioner did here, that "needed" facilities might be opened for all purposes. The problem is self-evidently one of programming months in advance every specialized commodity needed for defense purposes, a project which itself would require months of effort and the delays such effort would entail. Other obvious difficulties are not less formidable. Upon what basis would the plants to be reopened be chosen, assuming the number of plants needed could be determined? According to what standard would the production of particular complexes of plants be regulated? What of problems of cost and overhead, and the cost of and time required for intra-company planning to determine the practicality of partially restricting the operation of giant complexes such as those of the major producers?

No doubt a District Court is normally charged with the duty of independently shaping the details of a decree when sitting in equity in controversies that involve simple and relatively few factors—factors, that is, far less in number, less complicated and less interrelated than in the case before us. But a court is not qualified to devise schemes for the conduct of an industry so as to assure the securing of necessary defense materials. It is not competent to sit in judgment on the existing distribution of factors in the conduct of an integrated industry to ascertain whether it can be segmented with a view to its reorganization for the supply exclusively, or even pri-

marily, of government-needed materials. Nor is it able
to readjust or adequately to reweigh the forces of economic
competition within the industry or to appraise the rele-
vance of such forces in carrying out a defense program
for the Government. Against all such assumptions of
competence, the finding of the Court of Appeals was
amply supported by the record.

Even without such a finding, however, petitioner's
contention would fail. There are controlling reasons for
concluding that § 208 neither imposes upon the United
States, as a condition for securing an injunction, the bur-
den of establishing that the peril shown proceeds from the
unavailability of a "substantial number" of particular
facilities, nor limits the scope of the court's injunctive
process to such part of the total stoppage as appears to
be the cause in fact of the peril.

First, on its face § 208 states two separate criteria, both
of which must be satisfied before an injunction may
issue against a strike, and it states no other relationship
between them than that both must proceed from "such
strike." No other relationship is suggested by the legis-
lative history of these emergency provisions. There is,
accordingly, no foundation for the drastic limitation on
their scope which would be imposed if petitioner's con-
tention had been adopted, that a District Court is without
jurisdiction unless the abstract quantitatively substantial
character of the effect of the stoppage is found to be the
cause in fact of the peril.

The legislative history confirms what the provisions
themselves amply reveal, that this portion of the Taft-
Hartley Act contains a dual purpose, on the one hand to
alleviate, at least temporarily, a threat to the national
health or safety; and on the other to promote settlement
of the underlying dispute of industry-wide effect. The
former purpose is to be accomplished by the injunction,
and by whatever additional remedies the President may

seek and the Congress grant in pursuance of the command of § 210 of the Act that the matter be returned to Congress by the President with full report in the event of a failure of settlement within the injunction period. . The latter purpose is to be accomplished by the command of § 209 that the parties to the dispute "make every effort to adjust and settle their differences"; by the secret ballot of employees provided by § 209 with reference to the last offer of the companies; and finally by further action by the President and Congress pursuant to § 210. To hold, as petitioner alternatively urged, that a District Court may enjoin only that part of the total stoppage which is shown to be the cause in fact of the peril, would at best serve only the purpose of alleviating the peril, while stultifying the provisions designed to effect settlement of the underlying dispute.

Second, the evidentiary burdens upon the Government which would have resulted from the adoption of either of the constructions urged by petitioner would tend to cripple the designed effectiveness of the Act. It is extremely doubtful whether in strikes of national proportion information would be available to the United States within a reasonable time to enable it to show that particular critical orders were placed with particular facilities no longer available; or whether the United States could, within such time, effect a theoretical reorganization of its procurement program so as to demonstrate to a court that it cannot successfully be conducted without the reopening of particular facilities.

Finally, § 208 is not to be construed narrowly, as if it were merely an exception to the policies which led to the restrictions on the use of injunctions in labor disputes embodied in the Norris-LaGuardia Act, 47 Stat. 70 (1932), 29 U. S. C. §§ 101–115. Totally different policies led to the enactment of the national emergency provisions of the 1947 Act. The legislative history of these provi-

sions is replete with evidence of the concern of both the proponents and the opponents of the bill to deal effectively with large-scale work stoppages which endanger the public health or safety. To stop or prevent public injury, both management and labor were brought within the scope of the injunctive power; and both were subjected to the command to "make every effort to adjust and settle their differences . . . ." § 209. The preamble to the Act succinctly states this purpose:

> "Industrial strife which interferes with the normal flow of commerce . . . can be avoided or substantially minimized if employers, employees, and labor organizations each . . . above all recognize under law that neither party has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety, or interest. . . ." Labor Management Relations Act, 1947, § 1 (b), 61 Stat. 136, 29 U. S. C. § 141 (b).

The Norris-LaGuardia Act had limited the power of the federal courts to employ injunctions to affect labor disputes. The purpose of that Act was rigorously to define the conditions under which federal courts were empowered to issue injunctions in industrial controversies as between employers and employees, and to devise a safeguarding procedure for the intervention of the federal judiciary in the course of private litigation. It is not without significance that this Act was found not to deprive a federal court of jurisdiction to issue an injunction at the behest of the Government as industrial operator. *United States* v. *United Mine Workers of America*, 330 U. S. 258. Moreover, as the preamble to the Norris-LaGuardia Act indicated, the formulation of policy of that statute was made in 1932 "under prevailing economic conditions." Congress at different times and for different purposes may gauge the demands of "prevailing economic

conditions" differently or with reference to considerations outside merely "economic conditions." Here Congress has made the appraisal that the interests of both parties must be subordinated to the overriding interest of the Nation. The following observations of Mr. Justice Brandeis are apposite:

> "Because I have come to the conclusion that both the common law of a State and a statute of the United States declare the right of industrial combatants to push their struggle to the limits of the justification of self-interest, I do not wish to be understood as attaching any constitutional or moral sanction to that right. All rights are derived from the purposes of the society in which they exist; above all rights rises duty to the community. The conditions developed in industry may be such that those engaged in it cannot continue their struggle without danger to the community. But it is not for judges to determine whether such conditions exist, nor is it their function to set the limits of permissible contest and to declare the duties which the new situation demands. This is the function of the legislature which, while limiting individual and group rights of aggression and defense, may substitute processes of justice for the more primitive method of trial by combat." *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443, 488 (1921) (dissent).

These sections were designed to provide machinery for safeguarding the comprehensive interest of the community, and to promote the national policy of collective bargaining. They must be construed to give full effect to the protections they seek to afford.

Petitioner's final contention with regard to the statutory standard of peril to the national safety appears to have been that the United States must resort to other

modes of relief than this Act to meet the national peril created by a stoppage in a substantial part of an industry, before such peril can be said to exist or be threatened. In substance petitioner urged: (1) that the United States has powers under the Defense Production Act of 1950, 64 Stat. 798, 50 U. S. C. App. § 2061, the exercise of which would, even during the course of these proceedings, have permitted it to alleviate the critical shortages which in fact resulted or threatened to result from the strike; and (2) that the United States failed to reveal to petitioner or to the courts what plants might have been reopened so as to remove the peril to the national defense. In the light of what we have already said, it is apparent that neither of these matters is relevant to the judicial determination required by § 208. The remedy available to the United States under these provisions is independent of other powers possessed by it and is not encumbered by any burden upon it to seek to persuade or enable the defendants to effect a piecemeal alteration of their conduct to avoid the court's jurisdiction.

Because the District Court's finding of peril to the national safety resulting from impediments to the programs for national defense was itself sufficient to satisfy the requirement of § 208 (a) (ii), it is not necessary to determine whether perils to defense exhaust the scope of "safety" as used in this statute, or to consider its findings with regard to peril to the national health.

Having decided that the strike was one which created a national emergency within the terms of the statute, the next question is whether, upon that finding alone, the "eighty-day" injunction for which the Government prayed should have issued, or whether the District Court was to exercise the conventional discretionary function of equity in balancing conveniences as a preliminary to issuing an injunction. The petitioner argued that under the Act a District Court has "discretion" whether to

issue an "eighty-day" injunction, even though a national emergency be found. It argued that the district judge in this case did not consider that he had such "discretion." Alternatively, it argued that if the district judge did exercise "discretion" he abused it, for the broad injunctive relief he granted was not justifiable in this case. The contention was that the relief had the effect of hindering rather than promoting a voluntary settlement of the dispute, and of unnecessarily coercing hundreds of thousands of employees, when an injunction of only a small part of the strike, or other non-injunctive remedies, assertedly less drastic, were available, and would have equally well averted the threat to public safety. We do not think it necessary to embark upon the speculative consideration whether the district judge in fact made a discretionary determination, and, if he did, whether that determination was justifiable. We conclude that under the national emergency provisions of the Labor Management Relations Act it is not for judges to exercise conventional "discretion" to withhold an "eighty-day" injunction upon a balancing of conveniences.

"Discretionary" jurisdiction is exercised when a given injunctive remedy is not commanded as a matter of policy by Congress, but is, as a presupposition of judge-made law, left to judicial discretion. Such is not the case under this statute. The purpose of Congress expressed by the scheme of this statute precludes ordinary equitable discretion. In this respect we think the role of the District Courts under this statute is like the role of the Courts of Appeals under provisions for review by them of the orders of various administrative agencies, such as the National Labor Relations Board. 29 U. S. C. § 160 (e). This Court has held that if the Board's findings are sustained, the remedy it thought appropriate must be enforced. *Labor Board* v. *Bradford Dyeing Assn.*, 310 U. S. 318.

In the national emergency provisions of the Labor Management Relations Act, Congress has with particularity described the duration of the injunction to be granted and the nature of specific collateral administrative procedures which are to be set in motion upon its issuance. We think the conclusion compelling that Congress has thereby manifested that a District Court is not to indulge its own judgment regarding the wisdom of the relief Congress has designed. Congress expressed its own judgment and did not leave it to a District Court. The statute embodies a legislative determination that the particular relief described is appropriate to the emergency, when one is found to exist. Moreover, it is a primary purpose of the Act to stop the national emergency at least for eighty days, which would be defeated if a court were left with discretion to withhold an injunction and thereby permit continuation of an emergency it has found to exist. The hope is that within the period of the injunction voluntary settlement of the labor dispute will be reached, and to that end the statute compels bargaining between the parties during that time. If no voluntary settlement is concluded within the period of the injunction, the President is to report to Congress so that that body may further draw upon its constitutional legislative powers. How else can these specific directions be viewed but that the procedures provided are, in the view of Congress, the way to meet the emergencies which come within the statute? It is not for a court to negative the direction of Congress because of its own confident prophecy that the "eighty-day" injunction and the administrative procedures which follow upon it will not induce voluntary settlement of the dispute, or are too drastic a way of dealing with it.

We are also persuaded by the fact that, before the statute is invoked, there must be a Presidential determination that the "eighty-day" injunction is the promis-

ing method for dealing with the emergency arising from the labor dispute. Section 206 provides that whenever the President is of the "opinion" that a strike or lockout will create a national emergency, he may appoint a board of inquiry, which shall submit to him a report containing the facts relating to the dispute and the positions of the parties to it. Upon receiving this report the President "may" direct the Attorney General to petition to enjoin the strike or lockout. It is undoubtedly one of the factors in the President's decision to direct the Attorney General to act that he considers such an injunction the best available course to relieve the emergency. Such a decision by the President to invoke the courts' jurisdiction to enjoin, involving, as it does, elements not susceptible of ordinary judicial proof nor within the general range of judicial experience, is not within the competent scope of the exercise of equitable "discretion." It may be that the assumptions on the basis of which Congress legislated were ill-founded or have been invalidated by experience. It may be that the considerations on the basis of which the President exercised his judgment in invoking the legislation will be found wanting by hindsight. These are not matters within the Court's concern. They are not relevant to the construction of § 208 nor to its judicial enforcement. They certainly do not warrant the Judiciary's intrusion into the exercise by Congress and the President of their respective powers and responsibilities.

The Hecht Co. v. Bowles, 321 U. S. 321, heavily relied on, dealt with quite a different situation. There we held that the application of the Administrator of the Emergency Price Control Act of 1942 for an injunction of violations of that Act might be refused, in the exercise of the District Court's "discretion." But the scheme of the statute in Hecht v. Bowles was significantly different from that of the statute in this case. The Emergency Price Control Act of 1942 provided that the District

Court should grant, at the Administrator's application, "a permanent or temporary injunction, restraining order, or other order." This Court emphasized the alternative character of this provision for an "other order" as imparting to the District Court discretion to withhold an injunction. 321 U. S., at 328. Under the Labor Management Relations Act the District Court is given jurisdiction to enjoin "and to make such other orders as may be appropriate." Congress thus provided a jurisdiction additional to the power to grant an injunction, not alternative to it: an "other order" may only supplement an injunction, it may not supplant it. Beyond this difference are the considerations that, under the Emergency Price Control Act of 1942, an injunction did not, as it does here, bring into play other carefully prescribed relief designed by Congress to alleviate the cause of the evil which it was the purpose of the statute to correct, nor was the duration of the injunction specifically limited as in this case. There was not, therefore, in *Hecht* v. *Bowles* the strong showing we have here that the Congress has resolved the question of the appropriate form of relief for the condition the statute is meant to correct, and the Court there concluded that the Administrator's application for judicial relief was an appeal to the ordinary equity jurisdiction and "discretion" of the District Court. In *Hecht* v. *Bowles* itself the Court recognized that there might be "other federal statutes governing administrative agencies which . . . make it mandatory that those agencies take action when certain facts are shown to exist." 321 U. S., at 329. In essence this describes the situation under the Labor Management Relations Act.

We come finally to the petitioner's contention that the grant to the District Courts by § 208 (a) of the Labor Management Relations Act of jurisdiction to enjoin strikes such as this one is not a grant of "judicial Power" within the meaning of Art. III, § 2, of the Constitution,

and was therefore beyond the power of Congress to confer on the District Courts. What proceedings are "Cases" and "Controversies" and thus within the "judicial Power" is to be determined, at the least, by what proceedings were recognized at the time of the Constitution to be traditionally within the power of courts in the English and American judicial systems. Both by what they said and by what they implied, the framers of the Judiciary Article gave merely the outlines of what were to them the familiar operations of the English judicial system and its manifestations on this side of the ocean before the Union. Judicial power could come into play only in matters such as were the traditional concern of the courts at Westminster and only if they arose in ways that to the expert feel of lawyers constituted "Cases" or "Controversies."

. Beginning at least as early as the sixteenth century the English courts have issued injunctions to abate public nuisances. *Bond's Case,* Moore 238 (1587); *Jacob Hall's Case,* 1 Ventris 169, 1 Mod. 76 (1671); *The King* v. *Betterton,* 5 Mod. 142 (1696); *Baines* v. *Baker,* 3 Atk. 750, 1 Amb. 158 (1752); *Mayor of London* v. *Bolt,* 5 Ves. 129 (1799). See also Eden, Injunctions (3d ed. 1852), Vol. II, 259; Blackstone, Commentaries (12th ed. 1795), Vol. IV, 166. This old, settled law was summarized in 1836 by the Lord Chancellor in the statement that "the Court of Exchequer, as well as this Court, acting as a court of equity, has a well established jurisdiction, upon a proceeding by way of information, to prevent nuisances to public harbours and public roads; and, in short, generally, to prevent public nuisances." *Attorney-General* v. *Forbes,* 2 M. & C. 123, 133. And two years later this Court recognized that "it is now settled, that a court of equity may take jurisdiction in cases of public nuisance, by an information filed by the attorney general." *Georgetown* v. *Alexandria Canal Co.,* 12 Pet. 91, 98 (1838).

See also *Payne* v. *Hook,* 7 Wall. 425, 430. Since that time this Court has impressively enforced the judicial power to abate public nuisances at the suit of the Government. *In re Debs,* 158 U. S. 564. The crux of the *Debs* decision, that the Government may invoke judicial power to abate what is in effect a nuisance detrimental to the public interest, has remained intact. The heart of the case was approvingly cited by Mr. Justice Brandeis for the Court in *Jacob Ruppert* v. *Caffey,* 251 U. S. 264, 301. The scope of the injunction in the *Debs* case no doubt gave rise to the much-criticized extensive use of the injunction in ordinary employer-employee controversies. See Frankfurter and Greene, The Labor Injunction, pp. 18 *et seq.,* 62–63, and 190, and for the terms of the decree see p. 253. Congress dealt with this proliferating and mischievous use of the labor injunction first through the Clayton Act and later through the Norris-LaGuardia Act. But even the severest critics of the *Debs* injunction have recognized that it was not a "new invention." See, *id.,* p. 20. The judicial power to enjoin public nuisance at the instance of the Government has been a commonplace of jurisdiction in American judicial history. See, *e. g., Attorney General* v. *Tudor Ice Co.,* 104 Mass. 239, 244 (1870); *Village of Pine City* v. *Munch,* 42 Minn. 342, 343, 44 N. W. 197 (1890); *Board of Health* v. *Vink,* 184 Mich. 688, 151 N. W. 672 (1915).

The jurisdiction given the District Courts by § 208 (a) of the Labor Management Relations Act to enjoin strikes creating a national emergency is a jurisdiction of a kind that has been traditionally exercised over public nuisances. The criterion for judicial action—peril to health or safety—is much like those upon which courts ordinarily have acted. Injunctive relief is traditionally given by equity upon a showing of such peril, and the court, as was traditional, acts at the request of the Executive. There can therefore be no doubt that, being thus akin to jurisdic-

tion long historically exercised, the function to be performed by the District Courts under § 208 (a) is within the "judicial Power" as contemplated by Art. III, § 2, and is one which Congress may thus confer upon the courts. It surely does not touch the criteria for determining what is "judicial Power" that the injunction to be issued is not a permanent one, and may last no longer than eighty days. Given the power in Congress to vest in the federal courts the function to enjoin absolutely, it does not change the character of the power granted or undermine the professional competence of a court for its exercise that Congress has directed the relief to be tempered.

These controlling constitutional considerations were sought to be diverted by the petitioner through abstract discussion about the necessity for Congress to define legal rights and duties. The power of Congress to deal with the public interest does not derive from, nor is it limited by, rights and duties as between parties. Congress may impose duties and enforce obligations to the Nation as a whole, as it has so obviously done in the Labor Management Relations Act. Such congressional power is not to be subordinated to a sterile juristic dialectic.

MR. JUSTICE DOUGLAS, dissenting.

Great cases, like this one, are so charged with importance and feeling that, as Mr. Justice Holmes once remarked (*Northern Securities Co. v. United States,* 193 U. S. 197, 400–401, dissenting opinion), they are apt to generate bad law. We need, therefore, to stick closely to the letter of the law we enforce in order to keep this controversy from being shaped by the intense interest which

the public rightfully has in it. The statute, which Congress had authority to pass, speaks in narrow and guarded terms. Section 206 of the Labor Management Relations Act, 1947, 61 Stat. 155, 29 U. S. C. § 176, gives the President power to invoke the aid of a board of inquiry whenever he is of the opinion that a strike or lockout will imperil "the national health or safety." The President, in appointing the board of inquiry in this case, stated:

> "The strike has closed 85 percent of the nation's steel mills, shutting off practically all new supplies of steel. Over 500,000 steel workers and about 200,000 workers in related industries, together with their families, have been deprived of their usual means of support. Present steel supplies are low and the resumption of full-scale production will require some weeks. If production is not quickly resumed, severe effects upon the economy will endanger the economic health of the nation."

It is plain that the President construed the word "health" to include the material well-being or public welfare of the Nation. When the Attorney General moved under § 208 for an injunction in the District Court based on the opinion of the President and the conclusions of the board of inquiry, the union challenged the conclusion that "the national health or safety" was imperiled, as those words are used in the Act. The District Court found otherwise, stating five ways in which the strike would, if permitted to continue, imperil "the national health and safety":

> "(a) Certain items of steel required in top priority military missile programs of the United States are not made by any mill now operating, nor available from any inventory or from imports. Any further delay in resumption of steel production would result in an irretrievable loss of time in the supply of

weapons systems essential to the national defense plans of the United States and its allies.

"(b) The planned program of space activities under the direction of the National Aeronautics and Space Administration has been delayed by the strike and will be further delayed if it is continued. Specifically, project MERCURY, the nation's manned satellite program, which has the highest national priority, has been delayed by reason of delay in construction of buildings essential to its operation. This program is important to the security of the nation. Other planned space programs will be delayed or threatened with delay by a continuation of the strike.

"(c) Nuclear Submarines and the naval shipbuilding program other than submarines, including new construction, modernization, and conversion, have been affected by reason of the inability to secure boilers, compressors, and other component parts requiring steel. Products of the steel industry are indispensable to the manufacture of such items and delay in their production will irreparably injure national defense and imperil the national safety.

"(d) Exported steel products are vital to the support of the United States bases overseas and for the use of NATO allies and similar collective security groups. The steel strike, if permitted to continue, will seriously impair these programs, thus imperiling the national safety.

"(e) A continuation of the strike will have the ultimate effect of adversely affecting millions of small business enterprises, almost all of which are directly or indirectly dependent upon steel products and most of which lack the resources to stock large inventories. In addition, it will have the effect of idling millions

of workers and a large proportion of the facilities in industries dependent upon steel for their continued operation. Manufacturing industries directly dependent on steel mill products account for the employment of approximately 6,000,000 workers and normal annual wages and salaries totalling approximately $34,000,000,000. The products of these industries are valued at over $125,000,000,000. The national health will be imperiled if the strike is permitted to continue."

Here again it is obvious that "national health" was construed to include the economic well-being or general welfare of the country. The Court of Appeals, in sustaining the injunction, was apparently of the same view. This seems to me to be an assumption that is unwarranted. I think that Congress, when it used the words "national health," was safeguarding the heating of homes, the delivery of milk, the protection of hospitals, and the like. The coal industry, closely identified with physical health of people, was the industry paramount in the debates on this measure. The coal industry is indeed cited on the Senate side in illustration of the need for the measure. S. Rep. No. 105, 80th Cong., 1st Sess., p. 14. There were those in the Senate who wanted to go so far as to outlaw strikes "in utilities and key Nation-wide industries" in order to protect the "public welfare." 93 Cong. Rec. A1035. Reference was, indeed, made to strikes in industries "like coal or steel" among those to be barred in "the public interest." *Ibid.* But the Senate did not go that far. The Senate bill reached only situations where there was peril to the "national health or safety." [1] The House bill went further and included cases where there was peril to "the public health, safety,

---

[1] Legislative History of the Labor Management Relations Act, 1947 (G. P. O. 1948), Vol. I, pp. 274, 276.

or interest."[2] The Senate view prevailed, its version being adopted by the Conference.[3] Some light is thrown on the wide difference between those two standards—if words are to be taken in their usual sense—by the following colloquy on the floor of the House: [4]

"Mr. KENNEDY. I believe that this country should certainly be in a position to combat a strike that affects the health and safety of the people. Therefore, I feel that the President must have the power to step in and stop those strikes. I am not in the position of opposing everything in this bill, but there are certain things in the bill that are wrong. I do not see how the President is going to have the power to stop strikes that will affect the health and safety of the people under the procedure listed in section 203. I think he must have that power.

"I agree with you that any bill providing for an injunction should carefully consider the position of the striking union and make sure that their rights are protected. I think that in those cases Federal seizure until the dispute is settled would perhaps equalize the burden in the fairest possible manner.

"Mr. OWENS. Will not the gentleman admit that we have a third word in there? It is 'interest.' Could we not better use the word 'welfare' instead of 'interest,' because the word 'welfare' occurs in the Constitution? It is just as broad as the word 'interest' and more practical.

"Mr. KENNEDY. The proposal embraces two separate things, health and safety. Because the remedy is drastic these two, in my opinion, are sufficient. I believe we should apply this remedy when

---

[2] Legislative History, Vol. I, *supra,* Note 1, pp. 214–215.

[3] H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., p. 64.

[4] 93 Cong. Rec. 3513.

the strike affects health or safety, but not the welfare and interest, which may mean anything. I would not interfere in an automobile strike because while perhaps that affects national interest, it does not affect health and safety.

"Mr. OWENS. Does not the gentleman agree that 'welfare' is the stronger and in line with the President's idea?

"Mr. KENNEDY. No. Both 'welfare' and 'interest' are too indefinite. They could cover anything. I would not have the law apply except in cases where the strike affected health and safety."

To read "welfare" into "health" gives that word such a vast reach that we should do it only under the most compelling necessity. We must be mindful of the history behind this legislation. *In re Debs,* 158 U. S. 564, 584, stands as ominous precedent for the easy use of the injunction in labor disputes. Free-wheeling Attorneys General used compelling public demands to obtain the help of courts in stilling the protests of labor. The revulsion against that practice was deep, and it led ultimately to the enactment of the Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. § 101.[5] We deal, of course, with a later Congress and an Act that by § 208 (b) sets aside *pro*

[5] For discussion of the abusive use of blanket injunctions in labor controversies, see Allen, Injunction and Organized Labor, 28 Am. L. Rev. 828; Chafee, The Inquiring Mind, p. 198; Dunbar, Government by Injunction, 13 L. Q. Rev. 347; Frey, The Labor Injunction: An Exposition of Government by Judicial Conscience and its Menace; Lane, Civil War in West Virginia; Pepper, Injunctions in Labor Disputes, 49 A. B. A. Rep. 174; Royce, Labor, The Federal Anti-Trust Laws, and the Supreme Court, 5 N. Y. U. L. Q. Rev. 19; Stimson, The Modern Use of Injunctions, 10 Pol. Sci. Q. 189.

On the Norris-LaGuardia Act and what Congress intended to abolish by it, see Norris, Injunctions in Labor Disputes, 16 Marq. L. Rev. 157; Witte, The Federal Anti-Injunction Act, 16 Minn. L. Rev. 638.

*tanto* the earlier Act. What Congress has created Congress can refashion. But we should hesitate to conclude that Congress meant to restore the use of the injunction in labor disputes whenever that broad and all-inclusive concept of the public welfare is impaired. The words used—"national health or safety"—are much narrower.

Congress in the same Act knew how to speak when it spoke all-inclusively. The declaration of policy in the Labor Management Relations Act, 1947, speaks in broad terms. There is a declaration in § 1 (b) that "neither party has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety, or interest." 61 Stat. 136. The words "public . . . interest" cover five titles of a far-reaching regulatory measure. Yet, when Congress came to define the jurisdiction of courts to intervene in strikes or lockouts, it spoke in more restricted terms, confining the judiciary to injunctions where there is impending peril to "the national health or safety." That narrow reading is, indeed, the only one that can be squared with Senator Taft's explanation of the use of an injunction in a strike situation. The strike, he said, must not only affect substantially "an entire industry," it must also "imperil the national health or safety, a condition which, it is anticipated, will not often occur." [6] Yet, if "national

---

[6] 93 Cong. Rec. 6860.

Senator Smith said in like vein:

"Furthermore in title II of the bill we provide for the extreme cases which threaten national paralysis. To meet an industry-wide stoppage of some kind which may cause injury to the health or safety of 140,000,000 people, such as a transportation strike, or a coal strike, we have set up special machinery which will enable the Attorney General, on his own initiative, to petition the courts to prevent either a shut-down or a walk-out, until the mediation processes have had time to function." 93 Cong. Rec. 4281.

health" includes the public welfare, injunctions will issue whenever any important industry is involved—whether it be steel or automobiles or coal or any group of industries where one union makes collective agreements for each of the component unions.

It is a fact of which we can take judicial notice that steel production in its broadest reach may have a great impact on "national health." Machinery for processing food is needed; hospitals require surgical instruments; refrigeration is dependent on steel; and so on. Whether there are such shortages that imperil the "national health" is not shown by this record. But unless these particularized findings are made no case can be made out for founding the injunction on impending peril to the "national health."

Nor can this broad injunction be sustained when it is rested solely on "national safety." The heart of the District Court's finding on this phase of the case is in its statement, "Certain items of steel required in top priority military missile programs of the United States are not made by any mill now operating, nor available from any inventory or from imports." Its other findings, already quoted, are also generalized. One cannot find in the record the type or quantity of the steel needed for defense, the name of the plants at which those products are produced, or the number or the names of the plants that will have to be reopened to fill the military need. We do know that for one and a half years ending in mid-1959 the shipments of steel for defense purposes accounted for less than 1% of all the shipments from all the steel mills. If 1,000 men, or 5,000 men, or 10,000 men can produce the critical amount the defense departments need, what authority is there to send 500,000 men back to work?

There can be no doubt that the steel strike affects a "substantial" portion of the industry. Hence the first re-

quirement of § 208 (a) of the Act is satisfied.[7]   But we do know that only a fraction of the production of the struck industry goes to defense needs.   We do not know, however, what fraction of the industry is necessary to produce that portion.[8]   Without that knowledge the District Court is incapable of fashioning a decree that will safeguard the national "safety," and still protect the rights of labor.   Will a selective reopening of a few mills be adequate to meet defense needs?   Which mills are these?   Would it be practical to reopen them solely for defense purposes or would they have to be reopened for all civilian purposes as well?   This seems to me to be the type of inquiry that is necessary before a decree can be entered that will safeguard the rights of all the parties. Section 208 (a) gives the District Court "jurisdiction to enjoin" the strike.   There is no command that it *shall* enjoin 100% of the strikers when only 1% or 5% or 10% of them are engaged in acts that imperil the national "safety."   We are dealing here with equity practice which has several hundred years of history behind it.   We cannot lightly assume that Congress intended to make the

---

[7] Section 208 (a) provides:

"Upon receiving a report from a board of inquiry the President may direct the Attorney General to petition any district court of the United States having jurisdiction of the parties to enjoin such strike or lock-out or the continuing thereof, and if the court finds that such threatened or actual strike or lock-out—

"(i) affects an entire industry or a substantial part thereof engaged in trade, commerce, transportation, transmission, or communication among the several States or with foreign nations, or engaged in the production of goods for commerce; and

"(ii) if permitted to occur or to continue, will imperil the national health or safety, it shall have jurisdiction to enjoin any such strike or lock-out, or the continuing thereof, and to make such other orders as may be appropriate."

[8] The record shows, as does the President's statement, *supra*, that mills accounting for at least 15% of the Nation's steel production are still in operation and are unaffected by the strike.

federal judiciary a rubber stamp for the President. His findings are entitled to great weight, and I along with my Brethren accept them insofar as national "safety" is concerned. But it is the court, not the President, that is entrusted by Article III of the Constitution to shape and fashion the decree. If a federal court is to do it, it must act in its traditional manner, not as a military commander ordering people to work willy-nilly, nor as the President's Administrative Assistant. If the federal court is to be merely an automaton stamping the papers an Attorney General presents, the judicial function rises to no higher level than an IBM machine. Those who grew up with equity and know its great history should never tolerate that mechanical conception.

An appeal to the equity jurisdiction of the Federal District Court is an appeal to its sound discretion. One historic feature of equity is the molding of decrees to fit the requirements of particular cases. See *Brown* v. *Board of Education,* 349 U. S. 294, 300. Equity decrees are not like the packaged goods this machine age produces. They are uniform only in that they seek to do equity in a given case.[9] We should hesitate long before we

---

[9] Equity has contrived its remedies and has always preserved the elements of flexibility and expansiveness so that new ones may be invented, or old ones modified, to meet the requirements of every case. *Union Pacific R. Co.* v. *Chicago, R. I. & P. R. Co.,* 163 U. S. 564, 601. And the extent to which the Court may grant or withhold its aid, and the manner of molding its remedies may be affected by the public interest involved. *United States* v. *Morgan,* 307 U. S. 183, 194; *Securities & Exchange Comm'n* v. *United States Realty Co.,* 310 U. S. 434, 455. There is in fact no limit to the variety of equitable remedies which can be applied to the circumstances of a particular case. 1 Pomeroy's Equity Jurisprudence (5th ed.) § 109.

An equity court may, by trial for a limited term, determine just how much relief is required to meet the situation, and thereby avoid unnecessary hardship to any of the parties. McClintock on Equity (2d ed.) § 30; Pomeroy, *supra,* §§ 115, 116. This principle has been applied by this Court several times, *e. g.,* where an injunction was

conclude that Congress intended an injunction to issue against 500,000 workers when the inactivity of only 5,000 or 10,000 of the total imperils the national "safety." That would be too sharp a break with traditional equity practice for us to accept, unless the statutory mandate were clear and unambiguous. In situations no more clouded with doubt than the present one we have refused to read a statutory authority to issue a decree as a command to do it. *Hecht Co.* v. *Bowles,* 321 U. S. 321. We there said, "A grant of *jurisdiction* to issue compliance orders hardly suggests an absolute duty to do so under any and all circumstances." *Id.,* at 329. And see *Porter* v. *Warner Co.,* 328 U. S. 395, 398. The concurring opinion seeks to distinguish the *Bowles* case by laying great stress on the language of the statute there in issue to the effect that remedy by injunction "or other order" shall be granted, as distinguished from the use of the words "and to make such other orders" in § 208 presently involved. In the *Bowles* case, however, we expressly declined to reach the question whether it was an abuse of discretion for the District Court to deny *any* relief, which is what it did in that case. *Id.,* at 331. Moreover, the

---

sought against the pollution of a stream, the defendant was permitted to construct settling basins to alleviate the injury to the plaintiff and the injunction was modified to allow experiments toward that end. *Arizona Copper Co.* v. *Gillespie,* 230 U. S. 46. And when defendants' smelters emitted noxious fumes an injunction was withheld to permit them to devise a practical method of installing purifying devices. *Georgia* v. *Tennessee Copper Co.,* 237 U. S. 474. See also *Alexander* v. *Hillman,* 296 U. S. 222. A more recent instance where an equity decree was fashioned to meet problems far more complicated than those presented here will be found in *Nebraska* v. *Wyoming,* 325 U. S. 589, 665–672. The problem there was the division of waters among the States where enforcement of strict legal rights would have resulted in uneconomic and inequitable results. The multitude of factors weighed and appraised there makes the difficulties of the present case seem to be largely the product of imagination or prejudice, not realities of modern plant management.

language of the statute in the *Bowles* case stated that an injunction or other order "shall be granted." We have here no such command, since § 208 only provides that the District Court "shall have jurisdiction" to issue an injunction and other orders, as may be appropriate.

Plainly there is authority in the District Court to protect the national "safety" by issuance of an injunction. But there is nothing in this record to sustain the conclusion that it is necessary to send 500,000 men back to work to give the defense department all the steel it needs for the Nation's "safety." If more men are sent back to work than are necessary to fill the defense needs of the country, other objectives are being served than those specified in the statute. What are these other objectives? What right do courts have in serving them? What authority do we have to place the great weight of this injunction on the backs of labor, when the great bulk of those affected by it have nothing to do with production of goods necessary for the Nation's "safety" in the military sense of that word? Labor injunctions were long used as cudgels—so broad in scope, so indiscriminate in application as once to be dubbed "a 'scarecrow' device for curbing the economic pressure of the strike." See Frankfurter and Greene, The Labor Injunction (1930), pp. 107–108. The crop of evils that grew up during those regimes was different in some respects from those generated by this decree. The problems of vagueness, of uncertainty, of detailed judicial supervision that made police courts out of equity courts are not present here. But the same indiscriminate leveling of those within and those without the law is present. The injunction applies all the force of the Federal Government against men whose work has nothing to do with military defense as well as against those whose inactivity imperils the "national safety." It is not confined to the precise evil at which the present Act is aimed. Like the old labor injunctions that brought discredit to the federal

judiciary this is a blanket injunction broad and all-inclusive, bringing within its scope men whose work has nothing whatsoever to do with the defense needs of the Nation. Being wide of the statutory standard it has, to use the words of Mr. Justice Brandeis, all the vices of the injunction which is used "to endow property with active, militant power which would make it dominant over men." See *Truax* v. *Corrigan,* 257 U. S. 312, 354, 368 (dissenting opinion). I cannot believe that Congress intended the federal courts to issue injunctions that bludgeon all workers merely because the labor of a few of them is needed in the interest of "national safety."

Labor goes back to work under the present injunction on terms dictated by the industry, not on terms that have been found to be fair to labor and to industry. The steel industry exploits a tremendous advantage:

> "Our steel mills can produce in nine months all the metal the country can use in a year. That means a three-month strike costs the companies nothing in annual sales, and Uncle Sam picks up the tab for half of their out-of-pocket strike losses in the form of eventual tax adjustments.
>
> "The industry's final insurance against any acute financial pinch is the certainty that the President will have to step in with a national emergency injunction under the Taft-Hartley Act whenever steel stockpiles shrink to the danger level. This takes much of the bite out of the union's assault on the pocketbooks of the steel producers." [10]

This is a matter which equity should take into consideration. For a chancellor sits to do equity.

Some years ago this Court struck down as unconstitutional state statutes making arbitration of labor disputes

---

[10] Raskin, To Prove Karl Marx Was Wrong, N. Y. Times Magazine, Oct. 25, 1959, pp. 12, 84.

mandatory. *Wolff Co.* v. *Industrial Court,* 262 U. S. 522; *Dorchy* v. *Kansas,* 264 U. S. 286. Those cases held that compulsory arbitration violated the Due Process Clause of the Fourteenth Amendment. One can only guess as to what institutions of adjudication we might have in this field today had that experiment been given a chance. The experiment, however, did not survive, and we have had little experience with it.[11] Collective bargaining and mediation are today the norm, except for the period of time in which an injunction is in force. By the terms of § 209, however, any injunction rendered may not continue longer than 80 days. The Act thus permits an injunction restricted in duration and narrowly confined by the requirements of the "national health or safety." When we uphold this injunction we force men back to work when their inactivity has no relation to "national health or safety." Those whose inactivity produces the peril to "national health or safety" which the Act guards against and only those should be covered in the injunction. The rest—who are the vast majority of the 500,000 on strike—should be treated as the employers are treated. They should continue under the regime of collective bargaining and mediation until they settle their differences or until Congress provides different or broader

---

[11] It was stated in S. Rep. No. 105, 80th Cong., 1st Sess., pp. 13–14, in reference to the new machinery for settling labor disputes:

"Under the exigencies of war the Nation did utilize what amounted to compulsory arbitration through the instrumentality of the War Labor Board. This system, however, tended to emphasize unduly the role of the Government, and under it employers and labor organizations tended to avoid solving their difficulties by free collective bargaining. It is difficult to see how such a system could be operated indefinitely without compelling the Government to make decisions on economic issues which in normal times should be solved by the free play of economic forces." And see Dishman, The Public Interest in Emergency Labor Disputes, 45 Am. Pol. Sci. Rev. 1100 (1951).

remedies.   When we assume that all the steelworkers are
producing steel for defense when in truth only a fraction
of them are, we are fulfilling the dreams of those who
sponsored the House bill and failed in their efforts to have
Congress legislate so broadly.

Though unlikely, it is possible that, had the District
Court given the problem the consideration that it de-
serves, it could have found that the only way to remove
the peril to national safety caused by the strike was to
issue the broad, blanket injunction.   It may be that it
would be found impractical to send only part of the steel-
workers back to work.   The record in this case, however,
is devoid of evidence to sustain that position.[12]   Further-
more, there is no indication that the District Court
ever even considered such a possibility.   I am unwilling
to take judicial notice that it requires 100% of the workers
to produce the steel needed for national defense when
99% of the output is devoted to purposes entirely uncon-
nected with defense projects.

The trier of fact under our federal judicial system is
the District Court—not this Court nor the Court of Ap-
peals.   No finding was made by the District Court on
the feasibility of a limited reopening of the steel mills
and it is not, as the concurring opinion suggests, the
province of the Court of Appeals to resolve conflicts in
the evidence that was before the District Court.

I would reverse this decree and remand the cause to the
District Court for particularized findings [13] as to how the

---

[12] Such an opinion was stated in an affidavit by the Chairman of
the Council of Economic Advisers; but that is conclusional only.
There has been no sifting of the facts to determine whether defense
needs can be satisfied by practical means short of sending all men
back to work.

[13] The particularized findings necessary are illustrated by those in
United States v. Steelworkers, 202 F. 2d 132, 134:

"At its Dunkirk plant the company was then engaged in commerce
and in the production of goods for commerce, primarily in the 'heat

steel strike imperils the "national health" and what plants need to be reopened to produce the small quantity of steel now needed for the national "safety." [14]    There would also be open for inquiry and findings any questions pertaining to "national health" in the narrow sense in which the Act uses those words.

---

exchanger, pressure vessel and prefabricated pipe industry'; the threatened strike would not have affected all, or a substantial part, of that industry.    A major part of the Dunkirk plant's production was to carry out contracts the company had with the Atomic Energy Commission and certain of its prime contractors to furnish specialized articles which were essential to the completion of the Commission's program for construction of facilities needed to produce atomic bombs for the national defense.    These essential articles were heat exchanger shells used in the production of heavy water needed to operate nuclear reactors capable of producing fissionable materials, gas converter assemblies and other critical items all of which could have been obtained elsewhere only after other potential sources had been equipped to produce them.    Resort to other sources would, consequently, have involved months of delay and set back correspondingly the construction program of the Commission and the production of fissionable materials and atomic weapons vital to the national defense. The threatened strike would have affected a substantial part of the atomic weapon industry and would have imperiled the national safety."

[14] The factor of "safety" may well involve, for example, the need for replacement of equipment on railroad trains.    An affidavit of the Secretary of Commerce states:

"The continuing availability of most of these steel supplies is vital to the nation's health and safety, used as they are for the production of personal necessities, including surgical instruments, heating and refrigeration equipment, and articles used in the preparation and preservation of food.    Steel is also essential to transportation, to the production and transmission of light and power, to the provision of sanitation services, and in the construction and mining industries."

But the Government in oral argument conceded that neither that aspect of "safety" nor any other aspect of "safety" apart from military defense is presented by this record, since there are no findings showing the extent to which inventories for those other purposes may be in short supply.