SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, PACIFIC DISTRICT, Comprising Marine Firemen's Union, Sailors' Union of the Pacific, and Marine Cooks and Stewards; Sailors' Union of the Pacific; Pacific Coast Marine, Firemen, Oilers, Watertenders, and Wipers Association; and Marine Cooks and Stewards Union, Appellants,

v.

UNITED STATES of America, and Pacific Maritime Association, Appellees.

No. 17904.

United States Court of Appeals Ninth Circuit.

May 29, 1962.

Certiorari Denied June 18, 1962.

See 82 S.Ct. 1566.

438

Jennings, Haid, Gartland & Tilly, John Paul Jennings, and Neyhart & Grodin, and Duane Beeson, San Francisco, Cal., for appellants.

J. Paul St. Sure, Oakland, Cal., Richard Ernst, San Francisco, Cal., and William H. Orrick, Jr., Asst. Atty. Gen., Alan S. Rosenthal, and Edward A. Groobert, Attorneys, Department of Justice, Washington, D. C., for appellee.

Before HAMLEY, HAMLIN and BROWNING, Circuit Judges.

HAMLEY, Circuit Judge.

This case is before us on appeals from a preliminary injunction, a supplemental order, and an order denying a motion to modify the injunction, all entered under section 208 of the Labor Management Relations Act of 1947 (Act), 29 U.S.C.A. § 178. The injunction and orders were entered in a suit brought by the United States to enjoin continuation of the 1962 Pacific Coast maritime strike.

Named as defendants were Pacific Maritime Association (Association) and four unions. The Association represents, for collective bargaining purposes, the steamship companies comprising the West Coast maritime industry. The defendant unions are Seafarers International Union of North America, Pacific District, Sailors' Union of the Pacific, Pacific Coast Marine Firemen, Oilers, Watertenders and Wipers Association, and Marine Cooks and Stewards Union.

On March 16, 1962, after the unions and the companies had failed, following negotiation, to agree to terms of new collective bargaining agreements, the unions commenced a strike. If permitted to continue, the strike would have affected some 130 cargo and passenger ships, or over a majority of the American flag vessels operating out of the West Coast. On April 7, 1962, the President invoked the national emergencies procedure set out in sections 206–210 of the Act, 29 U.S.C.A. §§ 176–180. This led to the instituting of the instant action on April 11, 1962.

On that day the district court entered a temporary restraining order directing the employers to commence the sailing of ships and the seamen to perform their work on them. Defendants were ordered to show cause on April 16, 1962, why a preliminary injunction should not be issued.

Upon issuance of the temporary restraining order officials of the unions notified strikers to return to their ships, and preparations were made for sailings. Almost immediately, however, problems arose with regard to the length of time crewmen would be required to serve under their shipping articles.[1]

The shipping articles which prospective crewmen were asked to sign after entry of the restraining order contained the same provisions as those which seamen had been signing immediately prior to the strike. The period of time covered by such articles is a period continuing until the vessel has concluded its work at a final port of discharge, loading port, or bunkering port selected by the employer, with limitations as to locality not here material, and for a period of time not exceeding nine calendar months.[2]

It is apparent that, regarding the usual form of the shipping articles as ordinarily a commitment only for a complete voyage, it would nevertheless in many cases require crewmen to work beyond the maximum eighty-day period that the strike could be enjoined under the Act.[3]

Defendant unions and their members recognized that seamen could not insist upon articles which would entitle them to cease work on the eightieth day if the ship was at sea or was elsewhere than at an American port. But they wanted to be free to strike as soon after the eightieth day as the vessel on which they worked reached an American port. This would mean that if the eightieth day had run on or after a vessel reached an American port, seamen would be relieved of the obligation of thereafter serving until the vessel had concluded its work at a final port of discharge, loading port or bunkering port.

As seamen would not have this right under the usual form of the articles they, with the encouragement of their unions, declined to sign articles unless a rider was attached reading as follows:

"It is agreed between the Master and the unlicensed crew that in the event the vessel is in a U.S. port and

---

1. It is the regular and consistent practice in the maritime industry for shipping articles agreements to be signed for all voyages covered under the contract between Association employees and the seamen represented by defendant unions. The laws of the United States require that such articles be signed for most voyages (46 U.S.C.A. §§ 564, 565, 575), and the use of such contracts is a matter of custom for other voyages. The form of shipping articles contracts is specified by statute. See 46 U.S.C.A. § 713, Table A.

2. The duration of voyages, however, is ordinarily much less than nine months and it is the usual practice to terminate the shipping articles at the completion of a foreign voyage. When employees remain on board the vessel and sail on a subsequent voyage new shipping articles are signed, again for a term not exceeding nine calendar months.

3. 29 U.S.C.A. § 180 provides that, upon certification of the results of a secret ballot of the employees on the question of whether they wish to accept the final offer of settlement made by their employers, the Attorney General shall move the court to discharge the injunction, "which motion shall then be granted and the injunction discharged." Under the provisions of 29 U.S.C.A. § 179, this certification must be made not later than eighty days after entry of the injunction.

a bona fide strike or work stoppage occurs and the vessel is involved in such strike or work stoppage, either party to the collective bargaining agreement may terminate these Articles at such port by written notice to the other, in which event the unlicensed members of the crew shall be paid off by mutual consent. If the strike is called by a union which is not the collective bargaining representative of unlicensed crew members, the unlicensed crew members, shall be paid transportation from such port to the port of engagement."

The Association would not consent to the addition of such riders to the shipping articles. As a result crews could not be obtained which would permit a resumption of sailings after entry of the restraining order. On April 13, 1962, the district court was advised of this development and a hearing was immediately held. Both the Association and defendant unions told the court at this hearing that they would like to suggest provisions for inclusion in the preliminary injunction which would resolve, one way or the other, the impasse which had been reached concerning the form of shipping articles.

At the request of the Attorney General, made at this hearing, the district court determined to enter a preliminary injunction, and supporting findings of fact and conclusions of law, without awaiting the return day of April 16, 1962. The requests, made at the April 13, 1962 hearing by the Association of the defendant unions, for inclusion of particular provisions in the injunction order were set for hearing on the originally-scheduled return date of April 16, 1962. The provisions contained in the preliminary injunction, entered on April 13, 1962, are summarized in the margin.[4]

At the hearing held on April 16, 1962, the Association asserted that the use of the rider, which crewmen were insisting be added to the articles, would tend to frustrate and render meaningless the avowed purposes and design of the Act. They therefore moved for a supplemental order clarifying this issue.

Defendant unions argued in support of the riders. Consistent therewith, they moved for a supplemental order modifying the preliminary injunction to forbid the Association and its members from requiring crew members, during the period of the preliminary injunction, to sign articles which would be binding upon them during the discharge of cargo at any American port after the eightieth day.

The unions also asked for inclusion, in the supplemental order, of provisions which would modify the preliminary injunction to: (1) Require the Association

---

4. The preliminary injunction:

(1) Restrains all defendants (a) from continuing, encouraging or aiding a strike or lock-out in the maritime industry, or (b) from interfering with or affecting the orderly resumption and continuance of work in the industry "at the same rates of pay, hours of labor, and other terms and conditions of employment as were in effect immediately prior to March 16, 1962, subject to such modifications as defendants may agree upon, and from taking any action which would interfere with the court's jurisdiction in the premises."

(2) Restrains defendant unions from taking any action which would impede or interfere with due observance of and compliance with the injunction, provided that this paragraph shall not be construed to require an individual employe to render labor or service without his consent, nor to make the quitting of his labor or service an illegal act.

(3) Directs defendant unions (a) to instruct immediately all their members to resume their normal employment, as the ships may be made ready for sailing, (b) to take all action which may be necessary to insure that such instructions are carried out, and (c) to give notice forthwith to their members of the terms of the injunction order.

(4) Directs all defendants to engage in free collective bargaining in good faith for the purpose of resolving their dispute and to make every effort to adjust and settle their differences.

(5) Provides that the injunction shall remain in full force and effect until the further order of the court, and that the court retains jurisdiction for the purpose of granting such other and further relief as may be necessary.

and its members to pay off their crews on mutual consent and discharge them immediately upon entry in any American port after eighty days from April 11, 1962, and upon the making of their vessel safe and secure; and (2) Prohibit the Association and its members from sailing any vessel employing crew members represented by defendant unions from any American port upon a voyage in which more than one half of such voyage, as determined from the date of departure from such American port to the scheduled date of arrival at any American port, is scheduled to occur after the eightieth day.

After receiving affidavits and evidence and hearing argument at the April 16, 1962 hearing, the district court, on April 18, 1962, filed a supplemental order containing provisions which are summarized in the margin.[5]

At the same time that this supplemental order was filed, the court filed a memo-randum opinion and order denying the motion of defendant unions to modify the injunction in the respects requested by the unions, as described above.

The Marine Firemen's Union, on April 26, 1962, and the remaining defendants on April 30, 1962 appealed from the preliminary injunction of April 16, 1962, and the two orders of April 18, 1962. The appeals were consolidated and on motion of the parties, made on May 3, 1962, were expedited. Oral argument was had in this court on May 28, 1962.

Appellants argue that under paragraph 1(a) and (b), 2, 4 and 5 of the supplemental order, injunctive sanctions are imposed upon the unions or their members which will remain in effect after the preliminary injunction has been mandatorily discharged on or before the eightieth day, and that, in so providing, the district court exceeded its jurisdiction. They also argue that the preliminary injunction

5. The supplemental order:

(1) Restrains defendant unions from (a) demanding that the shipping articles be supplemented by any rider limiting the period of the voyage or granting seamen any right to terminate their articles prior to the time that the vessel has concluded its normal scheduled return voyage, has discharged and delivered all of its cargo, and has been shifted to a berth designated by the employer for its safe mooring should there be a resumption of strike activity, and (b) in any manner interfering with or affecting the orderly sailing of vessels on schedule for their normal voyage to completion of the work described above. Upon completion of the voyage the seamen shall be paid off by mutual consent. (We have divided this paragraph into [a] and [b] for convenience of discussion.)

(2) Directs defendant unions to instruct immediately their members who have been accepted for employment on vessels to sail pursuant to the provisions of the preliminary injunction of April 13, 1962, and to sign on normal shipping articles in the form prescribed by statute without the inclusion of the described rider.

(3) Provides that the standard form of shipping articles executed during the duration of the preliminary injunction shall contain the express provision that "the period of the hiring shall not ex-

tend beyond the duration of the particular voyage undertaken. * * *"

(4) Provides that defendant unions shall furnish the necessary replacements for crew members "so that any vessel sailing pursuant to the provisions of the preliminary injunction can, without interference by strike activity, continue to operate until all cargo loaded for the return voyage to the United States is taken to its port of destination and is discharged and delivered and the vessel is shifted to an appropriate and safe berth as directed by the employer."

(5) Restrains defendant unions from encouraging or taking part in any concerted activity of refusing or failing to sign on articles in the form referred to in paragraph (3) of the supplemental order, or to modify or alter those articles.

(6) Provides that nothing in the supplemental order shall be construed to require an individual employee to render labor or service without his consent nor to make the quitting of his labor or service an illegal act.

(7) Provides that a copy of the supplemental order be affixed to the articles when executed by seamen during the duration of the preliminary injunction " * * * and made a part thereof, with the same force and effect as if fully and completely set forth therein, and shall constitute notice to the individual members of defendant unions."

should have been modified in the respects which they had requested in order to avoid inequitable delay beyond the eightieth day before employed crewmen could join in any resumption of the strike.

The United States, appearing here as an appellee, defends some of the provisions of the supplemental order which appellants challenge, and also defends the order denying appellants' request for modification of the preliminary injunction. Without having appealed, however, the United States questions, on the same grounds as do appellants, the provisions of paragraphs 1(b) and 4 of the supplemental order.

Appellee Association defends the supplemental order in its entirety and also the order denying appellants' request for modification of the preliminary injunction.

■ In enacting the Labor Management Relations Act of 1947, Congress fashioned elaborate procedures to cope with strikes or lock-outs which have the effect of imperiling the national health or safety. The dual purpose of these procedures, incorporated in sections 206–210 of the Act, 29 U.S.C.A. §§ 176–180, is "* * * to alleviate, at least temporarily, a threat to the national health or safety; and * * * to promote settlement of the underlying dispute * * *." United Steel Workers of America v. United States, 361 U.S. 39, 51, 80 S.Ct. 1, 181, 4 L.Ed.2d 12, concurring opinion of Justices Frankfurter and Harlan.

The courts have a relatively minor role to play in these procedures. Of fifteen separate actions required to be taken,[6] the courts are involved in only two—the fifth step, in which the courts are required to issue an injunction if certain findings are made, and the fourteenth step, in which the courts are required to discharge the injunction.

In fulfilling the indicated dual-purpose of the Act, Congress looked primarily to individuals, officials, and institutions other than the courts—the President, board of inquiry, Federal Mediation Service, Attorney General, National Labor Relations Board, Congress, public and, above all, the disputing parties.

The function of the court in this statutory plan is limited not only in the respect mentioned, but also with regard to the kind of orders which may be enforced.

■ First, the only purpose for which an injunction may be entered under 29 U.S.C.A. § 178(a) (ii) is to enjoin a strike or lock-out, or the continuing thereof which, if permitted to occur or to continue, would imperil the national health or safety. Second, the only function which such an injunction may serve is to maintain the status quo as it existed before the actual or threatened strike or lock-out.[7] Third, in considering whether to grant or deny such an injunction, the courts may not enter into general inquiries of a character which would be entirely appropriate under other circumstances.[8] Fourth, if an injunction is is-

---

6. See 29 U.S.C.A. § 176–180.

7. Thus, in the Steelworkers case, the court said, at page 41, 80 S.Ct. at page 3, that the basic purpose of Congress in providing for the issuance of such injunctions was "to see that vital production should be *resumed* or *continued* for a time while further efforts were made to settle the dispute." (Emphasis added.) Later in the same opinion, and to the same effect, the court said: "* * * But the statute does recognize certain rights in the public to have *unimpeded* for a time production in industries vital to the health or safety." (Page 43, 80 S.Ct. page 4, emphasis added.)

8. For example, the courts may not inquire as to whether national labor policy will be served, or whether other remedies are available, or as to the effect of such an injunction upon the collective bargaining process in the particular case. Nor may they consider the merits of the parties' position or the conduct of their negotiations. The detailed procedures outlined in the Act "* * * represent a congressional determination of policy factors * * *" Steelworkers case, at page 41, 80 S.Ct. at page 3. All that is left for the courts in deciding whether to issue an injunction, is a determination as to whether a strike or lock-out, threatened or actual, affects an industry of the kind

sued it must be industry-wide, and may not be fashioned to permit selective relief on some basis deemed adequate to meet the needs of the national health and safety. Steelworkers case, at page 43, 80 S.Ct. at page 4. *Fifth,* the injunction must be discharged not later than eighty days after its issuance. 29 U.S.C.A. §§ 179–180.

Subject only to these limitations as to purpose, function, scope and duration, however, the courts have full power to fashion an injunction which will meet the situation. In this respect, as Justices Frankfurter and Harlan said in their concurring opinion in the Steelworkers case, at page 52, 80 S.Ct. at page 181, section 208 of the Act, 29 U.S.C.A. § 178,

> " \* \* \* is not to be construed narrowly, as if it were merely an exception to the policies which led to the restrictions on the use of injunctions in labor disputes embodied in the Norris-LaGuardia Act, 47 Stat. 70 (1932), 29 U.S.C. §§ 101–115. Totally different policies led to the enactment of the national emergency provisions of the 1947 Act."

■ Section 178(a) (ii) confers jurisdiction on the court not only to issue an injunction against a strike or lockout, but also " \* \* \* to make such other orders as may be appropriate." The context in which the provision for "other" orders appears, and the limiting word "appropriate," indicate to us that this grant of power was expressly included to insure that the courts would not be prevented from issuing such ancillary orders as may be necessary to fully effectuate and implement the basic injunction against the strike or lock-out. We do not construe this as granting a separate equi-

table jurisdiction which would be free of the restraints, including the restraint as to duration, imposed on the issuance of the basic injunction.[9]

■ In our opinion a supplemental order which has the practical effect of extending the time injunctive sanctions are in effect, beyond that permissible under the injunction itself, or which is designed to serve purposes or functions which the injunction may not serve is inconsistent with the manifested Congressional intent that upon the discharge of the injunction the parties should be returned to the *status quo* as it existed immediately preceding the invocation of the national emergency provisions. This is true notwithstanding the fact that the court may believe that such extended duration or additional purposes or functions would be necessary in order to obtain a full resumption of production during the eighty-day period.

The statutory limitation upon the duration of injunctions issued under the Act is spelled out in words of command. Only such production as may be compelled by injunctive sanctions limited to eighty days, may be achieved either under the injunction or any order supplemental thereto.

It is immaterial that, due to the uniqueness of the industry or prevailing economic conditions this may be less than full production. Congress has not provided the courts with an elastic jurisdiction to meet such special problems. It has chosen to draw the line at eighty days. Economic waste and productive inefficiency resulting from such abrupt termination of the injunction may be appropriate considerations in urging amendment of the Act, but they do not provide

described in the statute in such a manner that, if permitted to occur or continue, will imperil the national health or safety. If findings of this kind are made, the court has no alternative but to issue the injunction. 29 U.S.C.A. § 178(a) (i), (ii).

9. In their concurring opinion in the Steelworkers case, at page 59, 80 S.Ct. at page 185, Justices Frankfurter and Harlan

stated that in authorizing the issuance of "other" orders, Congress provided a jurisdiction "additional" to the power to grant an injunction. They also indicated, however, that such an order may only "supplement" the injunction, it may not "supplant" it. The over-all meaning thus conveyed is consistent with our view that this is an ancillary, not an independent, jurisdiction.

the court with jurisdiction which has been denied by Congress.

Having stated the principles which will govern us in disposing of this appeal we now turn to a discussion of the particular provisions of the supplemental order which are challenged.

■ Paragraphs 1(a), 2 and 5 of the supplemental order,[10] provide in effect that appellant unions shall not insist upon a rider to the shipping articles of the kind quoted earlier in this opinion, shall instruct their members to sign articles without such rider, and shall not encourage or take part in any concerted activity of refusing or failing to sign articles in the usual form without such rider.

The restraints and duties thus placed upon appellant unions are expressly effective only during the eighty days the injunction may be in effect. Appellants argue, however, that by requiring that the articles be in their usual form, free from such a rider, prospective crew members who sign the articles are required to work after reaching an American port, and after the eighty-day period, if the vessels on which they are employed require additional time to unload cargo and reach final destination.

One misgiving which appellants may have concerning these provisions can be quickly dispelled. If a vessel reaches an American port on or after the eightieth day, and crew members who have signed articles in the usual form then leave the vessel and go on strike before the ship completes unloading and reaches final destination, such crewmen do not thereby violate the injunction or supplemental order and are not subject to contempt proceedings.

It is nevertheless true that the supplemental order employs injunctive sanctions to obtain signatures to shipping articles which contractually bind the signers to serve for periods which may extend far beyond the eightieth day. But since these are the kind of articles the crewmen were signing immediately prior to the calling of the strike, the provisions in question do no more than maintain the *status quo*. This, as we have held, is permissible under § 178 and, in fact, required to effectuate the Congressional purpose.

We therefore conclude that the provisions of paragraphs 1(a), 2 and 5 of the supplemental order are "appropriate" within the meaning of the statute, and that the district court had jurisdiction to prescribe them.[11]

■ On the same reasoning we hold that the court did not err in refusing to modify the injunction to prohibit sailings where less than half of the voyage would occur before the eightieth day.

■ Paragraph 1(b) of the supplemental order,[12] could be construed as pertaining only to the restraint placed upon defendant unions under paragraph 1(a) with regard to the form of shipping articles. However, it is also open to the construction that, apart from the signing of articles, the unions are thereby enjoined from interfering with or affecting the orderly sailing of vessels on schedule for their normal voyage to completion of the work as described in paragraph 1(a).

If so construed, it is apparent that the restraint thereby placed upon the unions might extend beyond the eightieth day notwithstanding the vessel has reached an American port. Thus the union would be enjoined from calling a strike which would interfere with or affect the sailing of a vessel scheduled to sail from Los Angeles to San Francisco on the eighty-first day, in order to discharge cargo and reach final destination. This application of paragraph 1(b), which all parties appear to regard as not only possible, but intended, finds additional support in the concluding words of paragraph 1(b), " * * * should there be a resumption of strike activity * * *."

10. See note 5 above.

11. We necessarily deny appellants' request that this court enter an order which would in effect modify articles entered

into since issuance of the injunction, to release crewmen from the contractual duty to serve beyond the eightieth day.

12. See note 5 above.

The Association, in effect conceding that the injunctive effect of paragraph 1(b), as so construed, could continue after the eightieth day, defends it as necessary in order to assure "full production" during the eighty-day period. It argues that shippers and passengers will not use vessels which will reach American ports on return voyages after the eightieth day, unless they are assured that their freight and baggage can be promptly unloaded at the destination intended.

In the Association's view, this prospective loss of cargo and passengers would render sailing from American ports economically infeasible towards the latter part of the eighty-day period. It would therefore be necessary, they argue, to cancel such sailings, thereby curtailing the "full production" which, in their view, the injunction is expected to assure.

The association acknowledges that, since September, 1961, when the last collective bargaining agreement expired, shipping companies on the West Coast have been operating against the hazard of a possible strike. But they point out that never before this strike have the unions struck cargo, and hence never before did prospective shippers and passengers realize the risk they were taking. Thus while the hazard, insofar as the legal right to strike cargo is concerned, is no greater than before, it is urged that it now has more effect than formerly in the direction of discouraging traffic.

The district court accepted this view and, insofar as the economic implications are concerned, so do we. Under the principles stated above, however, such factors do not provide a jurisdictional basis for extending injunctive sanctions beyond the eightieth day. As between the desired achievement of full production during the eighty days, and the termination of all vestiges of judicial restraint on the eightieth day, the former must give way to the latter. The district court was without jurisdiction to enjoin appellant unions from interfering with or affecting the orderly sailing of vessels on schedule for their normal voyage to completion of the voyage, insofar as such union activity might take place after the discharge of the preliminary injunction.

The conclusion just stated is equally applicable with respect to paragraph 4 of the supplemental order.[13] The district court was without jurisdiction to direct appellant unions to furnish the necessary replacements for crew members, insofar as this would require the unions to engage in such activity after the discharge of the injunction.

The provisions of paragraphs 1(b) and 4, which we have held to be invalid insofar as they have injunctive effect beyond the eightieth day, are entirely appropriate insofar as union activity during the eighty-day period is concerned. The extent to which these provisions are invalid under the present form of the order, will be obviated by inclusion in the order of a provision terminating the order upon the discharge of the injunction.

We deem it proper to remind the parties that the national emergency procedures of the Labor Management Act of 1947, which have now been invoked, place a mandatory responsibility upon them to make every effort to adjust and settle their differences. See 29 U.S.C.A. § 179 (a).[14] It appears to us that their prime preoccupation now should not be with regard to what will happen if the strike is resumed after the eightieth day, but as to how that blow to the national health and safety may be avoided.

The order of April 13, 1962, granting the preliminary injunction, and the order of April 16, 1962, denying the motion of appellant unions to modify the preliminary injunction in certain respects, are affirmed. The motion of appellants, made in this court, for an order modifying outstanding shipping articles, signed after

---

13. See note 5 above.

14. We have been advised that this is the nineteenth time that the national emergency procedures have reached the point of issuance of an injunction, and that in all but four of the previous eighteen instances. the labor dispute was settled before discharge of the injunction on the eightieth day.

issuance of the supplemental order of April 16, 1962, is denied. The latter order is affirmed, provided that there be added thereto a provision terminating that order upon the discharge of the injunction. The cause is remanded so that this may be done.

The parties will bear their own costs on this appeal. The certified judgment of this court will issue on June 4, 1962 unless a petition for rehearing is filed on or before 12:00 o'clock noon on that day.