UNITED STATES of America,
Plaintiff,

v.

INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, AFL–CIO, LO-
CAL 418, et al., Defendants.

No. 71 C 2416.

United States District Court,
N. D. Illinois, E. D.

Nov. 3, 1971.

William J. Bauer, U. S. Atty., James H. Alesia and John Simon, Asst. U. S. Attys., for plaintiff.

Irving M. Friedman, Katz & Friedman, Chicago, Ill., for defendant Local 418.

Howard Barron, Jenner & Block, Chicago, Ill., for defendant grain companies.

MAROVITZ, District Judge.

This cause having come on for hearing on the application of plaintiff, the United States of America, for an injunction as prayed for in its verified complaint, and the Court having considered all evidence submitted herein, the pleadings, memoranda of law, and argument of counsel, makes the following Findings of Fact and Conclusions of Law with respect to said application:

## FINDINGS OF FACT

1. This action is founded upon the provisions of the Labor Management Relations Act, Title 29, United States Code, Section 178.

2. Pursuant to the provisions of the above Act, this action was instituted by the Attorney General of the United States at the direction of the President of the United States.

3. All of the defendants were duly served with process. An answer was filed by the defendant Local 418. All parties had full opportunity to participate in the hearings before the Court. Affidavits by various persons on behalf of the plaintiff were received as part of the pleadings but not as evidence in view of the objections of defendant Local 418. Witnesses were presented on behalf of the plaintiff and defendant Local 418, and various exhibits tendered by those parties were received in evidence.

4. Defendant, International Longshoremen's Association, AFL–CIO, Local 418, (hereinafter sometimes referred to as Local 418), is an unincorporated organization representing, among others, employees in an industry which is engaged in trade, commerce, transportation, transmission and communication among the several States and with foreign nations and which is represented by duly authorized officers and agents within the jurisdiction of this Court, including, but not limited to, John F. McQuade, President, John Garvey, Vice-President, Raymond Murawski, Secretary-Treasurer, Santiago Ortiz, Tony Greene, John Dienes and Herbert Simmons, negotiators. Defendant, International Longshoremen's Association, AFL–CIO, Local 418, is affiliated with the defendant, International Longshoremen's Association, AFL–CIO.

5. Continental Grain Company, Garvey Grain, Inc., Indiana Grain Cooperative Division of Indiana Farm Bureau Cooperative Association, Inc., Dixie Portland Flour Mills, Inc., Farmers Grain Dealers Association of Iowa and Carey Grain Corporation, defendants in this cause, are employers who operate grain elevators or are otherwise engaged in related or associated pier activities and serve as the bargaining agencies with respect to rates of pay, wages, hours, terms and conditions of employment, in unresolved labor disputes between the aforenamed employers and the defendant, Local 418.

6. Labor disputes exist between the aforenamed employers and the employees represented by defendant, Local 418. As a result of the disputes existing between the defendant union and defendant employers, a strike commenced on September 1, 1971 and continued until October 9, 1971, when it ceased by operation of a Temporary Restraining Order issued by this Court in this cause on October 6, 1971. The Temporary Restraining Order was continued in full force and effect to October 14, 1971, and by agreement of

the parties it was continued in effect to and including 5:00 P.M. on November 3, 1971.

7. Prior to directing the institution of this suit, the President of the United States, on October 4, 1971, acting under the provisions of Section 206 of Title 29, United States Code, issued Executive Order #11,621, whereby he created a Board of Inquiry to inquire into the issues involved in the disputes mentioned in said Executive Order. The Executive Order named the International Longshoremen's Association, AFL–CIO, the International Longshoremen's Association and Warehousemen's Union, and in the amendment it named the International Association of Machinists and Aerospace Workers, AFL–CIO and District Lodge 94 and Local Lodge 1484 thereof. The defendant, Local 418, was not named in the Executive Order or in the amendment thereof.

8. In issuing said Executive Order, the President made a finding that the aforementioned disputes have resulted in strikes affecting a substantial part of the maritime industry, an industry engaged in trade, commerce, transportation, transmission or communication among the several States and with foreign nations and that such strikes, if permitted to continue, would imperil the national health and safety.

9. The Board of Inquiry convened by direction of the President to inquire into the issues involved in the disputes made its written report to the President on October 6, 1971. Said report was submitted in accordance with the provisions of Section 206 of Title 29, United States Code. Certain labor organizations appeared before the Board of Inquiry in hearings. Local 418 was not invited to appear but only to state a position by telephone or telegram.

10. The strike by employees represented by defendants, Local 418, has prevented the movement of agricultural commodities through 9 of the 11 grain elevators located in the Chicago, Illinois area. These grain elevators include two elevators operated by Continental Grain Company, three elevators operated by Garvey Grain, Inc., and elevators operated by Farmers Grain Dealers Association of Iowa, Dixie Portland Flour Mills, Inc., Indiana Grain Cooperative Division of Indiana Farmers Bureau Cooperative Association, Inc. and Carey Grain Corporation. Only three of these elevators, namely Continental B, Continental C, and Gateway handle corn and soybeans.

11. Strikes have also affected marine terminal facilities in Atlantic, Pacific and Gulf ports, impairing operations of a substantial portion of the maritime industry and also a substantial portion of the marine terminal facilities in the United States. Defendant, Local 418, is not the same union involved in the dispute which has caused the strike affecting marine terminal facilities at Pacific ports. The contract previously in effect between defendant employers and defendant Local 418, is not the same as the contract existing between unions and employers who are involved in strikes affecting marine terminal facilities in Atlantic ports. The local unions involved in said disputes and strikes at Atlantic and Gulf ports are affiliated with the International Longshoremen's Association, AFL–CIO.

12. No previous application has been made by or on behalf of the United States for the relief sought in this cause.

13. The period between October 1, 1971 and December 15, 1971, is the peak season for the handling of soybeans and corn through the marine terminal facilities in the Chicago, Illinois area. The St. Lawrence Seaway is closed on or about December 15, 1971 until on or about April 15, 1972.

14. Since about October 6, 1971, the strike in the Pacific ports has ceased following an injunction issued by a United States District Court. Since about October 25, 1971, the strike in the port of New Orleans has ended pursuant to an injunction.

15. During the period involved herein, there have been no strikes in any of the Gulf ports located in the State of Texas. During the period involved

herein, all of the ports on the Great Lakes, other than those grain elevators affected by the strike of Local 418 in Chicago have remained open. These include the grain-shipping ports of Milwaukee, Toledo, and Duluth-Superior.

16. The principal commodities for storage and shipment abroad that have been affected by the strike of Local 418 are corn and soybeans. The grain elevators that handle corn and soybeans that were closed by the strike of Local 418, Continental B, Continental C, and Gateway, have a combined storage capacity of approximately 20,000,000 bushels. The Cargill elevator in Chicago was not affected by the strike, and it has a storage capacity of 23,000,000 bushels.

17. If the strike of Local 418 were to continue from now until the end of the Great Lakes Shipping Season around December 14, 1971, approximately 35,000,000 bushels of corn and soybeans that would otherwise be received and shipped from the struck elevators would be affected.

18. The Cargill elevator in Chicago could, in the event of such a strike by Local 418 at the other Chicago elevators, increase its shipments of corn and soybeans by about 20%, or about 1,000,000 bushels per week. The Continental elevator in Milwaukee, which has unrestricted deep water shipping facilities and which is not presently busy, could handle additional shipments of corn and soybeans of about 2,000,000 bushels per week. The Cargill elevator in Milwaukee, which is not presently busy, accommodates small ocean going vessels and lake vessels, and it could handle additional shipments of about 2,000,000 bushels per week on such vessels. As it is customary to schedule shipments of grain from alternative ports, such as Chicago, Duluth, Milwaukee and Toledo, shipment of all or substantially all of the grain in question could be made from the Cargill elevator in Chicago and from the Continental and Cargill elevators in Milwaukee, instead of from the struck elevators in Chicago.

19. The strike of Local 418 in Chicago involves 200 longshoremen who work inside the grain elevators. It does not involve the members of Local 101, International Longshoremen's Association, AFL–CIO, who are the graintrim who load corn and soybeans (and other commodities) from the elevators into vessels. In the event the strike of Local 418 were resumed, the members of Local 101 would continue to handle the shipment of commodities from the Cargill elevator, whose inside workers are also unaffected by the strike of Local 418.

20. The members of Local 418 involved in its strike constitute .0009% of the total number of maritime workers (208,000) in the United States, or .0036% of all the longshoremen in the United States (55,000). The port of Chicago ranks fifteenth among all United States ports in its total volume of all exports, handling approximately 1.75% of all U.S. exports.

21. The total value of all exports of soybeans and corn from all United States ports represents approximately 2.8% and 1.9%, respectively, of the dollar value of all United States exports. The entire port of Chicago accounts for approximately 10% of United States shipments of corn and 9% of soybeans, or under ½ of one percent of all United States exports, on an annual basis.

22. The amount of corn and soybeans that would be shipped from the port of Chicago, from the elevators affected by the strike of Local 418, from now until the end of the shipping season, would be about 35,000,000 bushels, or about 3.8% of the total of 900,000,000 bushels of those commodities to be shipped from all United States ports.

23. The value of the corn and soybeans that would be shipped from the elevators that would be affected by the continuation of the strike of Local 418 in Chicago would be approximately $75,000,000. The total value of all United States exports in the year 1970 was approximately $43,226,000,000.00. The deficit in the United States balance of payments in 1970 was approximately $3,589,000,000.00.

24. The employers in the port of Chicago who would be affected by a continuation of the strike of Local 418 are not involved in any activities related to any military or defense program of the United States.

25. The continuation of the strike by Local 418 would not involve any employers in any field related to national health.

26. Local 418 has local autonomy, under the constitution of the International Longshoremen's Association, AFL–CIO, to negotiate and execute its contract with the employers in the port of Chicago. The International Longshoremen's Association, AFL–CIO, does not have the power under its constitution to call off a strike of Local 418.

27. The Attorney General has not instituted any proceedings to enjoin the strikes of the International Longshoremen's Association, AFL–CIO, which has closed the Atlantic coast seaports and most of the Gulf Coast ports of the United States.

28. The strike of Local 418 in the port of Chicago does not affect the entire maritime industry or a substantial part of the maritime industry.

29. If the strike of Local 418 is permitted to continue it will not imperil the national health and safety.

### CONCLUSIONS OF LAW

1. Under the limiting provisions of the Act under which this suit was brought, 29 U.S.C. § 178(a) (i), (ii), this Court has no jurisdiction to enjoin the strike of Local 418 as such strike does not affect an entire industry or a substantial part thereof engaged in trade, commerce, transportation, transmission or communication among the several States or with foreign nations, or engaged in the production of goods into commerce, and if permitted to occur or continue, such strike will not imperil the national health or safety.

2. As this Court is without jurisdiction to enjoin the strike of Local 418 under the provisions of 29 U.S.C. § 178(a) (i), (ii), the Complaint is dismissed.

### OPINION

When asked to grant an "eighty-day" injunction under the emergency provisions of 29 U.S.C. § 178, as we are now being asked to do, a Court must be certain that it is viewing the entire proceeding from a proper factual and legal perspective given the narrow and limited scope of that section. We must be cognizant of the fact that we are being asked to do the extra-ordinary rather than the ordinary. The recognition of the right to strike was long in coming and remains labor's only weapon to equalize the sometimes gross inequities in power that previously existed between labor and management. The entire history of the labor injunction is thus permeated with the language of limitation and is imbued with a rigidity that recognizes the sterile and insulated conditions, uncontaminated by extrinsic influences and pressures, under which labor negotiations must proceed. The failure to maintain this delicate balance that exists between labor and management and the abusive implementation by Federal Courts of the injunction measure with an elasticity it was never intended to have, necessitated the restrictions embodied in the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115. As Justice Douglas aptly stated in United Steelworkers of America v. United States, 361 U.S. 39 at 73, 80 S.Ct. 1 at 10, 4 L.Ed.2d 12 (dissenting opinion):

> "Labor injunctions were long used as cudgels—so broad in scope, so indiscriminate in application as once to be dubbed 'a "scarecrow" device for curbing the economic pressure of a strike' ".

Justices Harlan and Frankfurter, concurring in Steelworkers, 361 U.S. at 53, 80 S.Ct. 177, at 182, saw the Norris-La-Guardia Act as limiting "the power of the federal courts to employ injunctions to affect labor disputes. The purpose of that Act was rigorously to define the conditions under which federal courts were empowered to issue injunctions in industrial controversies as between employers and employees, and to devise a

safeguarding procedure for the intervention of the federal judiciary in the course of private litigation."

■ The Government soon realized, however, that it must have the power to terminate strikes that threaten a national emergency and Congress therefore legislated § 208 of the Labor Management Relations Act, 29 U.S.C. § 178. It is under this provision that the Government is proceeding in this case. Though the Act was never envisioned as creating an "eighty-day" wonder that would magically resolve labor management disputes in critical industries, it recognized certain rights in the public to have unimpeded for a time, production in industries vital to the national health and safety and established machinery to obtain a peaceful settlement of the underlying dispute during the pendency of the injunction. While the Supreme Court in the Steelworkers case, (concurring opinion 361 U.S. at 52, 80 S.Ct. 177, at 181) indicated that "§ 208 is not to be construed narrowly, as if it were merely an exception to the policies which led to the restrictions on the use of injunctions in labor disputes embodied in the Norris-LaGuardia Act" and that "[t]otally different policies led to the enactment of the national emergency provisions of the 1947 Act," § 208 is nevertheless succinct on its face as to the conditions that must exist before it can be invoked. It provides that:

"(a) Upon receiving a report from a board of inquiry the President may direct the Attorney General to petition any district court of the United States having jurisdiction of the parties to enjoin such strike or lock-out or the continuing thereof, and if the court finds that such threatened or actual strike or lock-out—

(i) affects an entire industry or a substantial part thereof engaged in trade, commerce, transportation, transmission, or communication among the several States, or with foreign nations, or engaged in the production of goods for commerce; and

(ii) if permitted to occur or to continue, will imperil the national health or safety, it shall have jurisdiction to enjoin any such strike or lockout, or the continuing thereof * * * *"

With the long history of judicial restraint in the issuance of injunctions uppermost in this Court's mind we are compelled to deny the Government's motion for injunctive relief given the absence of a threat to the national safety and health and the lack of an industry-wide strike in the present case.

I.

■ The Government draws an elaborate map of the national and international grain market, with Chicago as its capital, and contends that Local 418's work stoppage has sent dire economic repercussions throughout the industry resulting in immediate and irreparable injury to the national health and safety. We fail to be convinced by both the factual and legal contentions of the Government and find that a) § 178 precludes the enjoining of a strike on purely economic grounds absent some element of national defense; b) assuming that such a legal construction were possible the findings indicate that injury to the extent alleged does not exist and c) even allowing for the existence of the type of injury alleged by the Government, it is so remote and insubstantial as to fall far short of this Court's § 178 jurisdictional power to grant relief.

■ The words "imperil" and "national health or safety" when being used in a labor context are terms of art of a most precise and limited meaning. The Government expends a great deal of time and effort in its attempt to engraft an economic context on the statutory terms of "national health or safety". In conjuring up every conceivable economic argument as grounds for this Court's jurisdiction to enjoin this strike the Government is asking us to do what no other Court has ever done before—to enjoin the strike of a single local on a purely economic basis totally devoid of any threat to the national defense or any

war effort as such. This is not the first attempt by the Government to give "national health" a fiscal rather than a physical connotation. In United States Steelworkers, 361 U.S. at 41–42, 80 S.Ct. at 3–4, the Supreme Court deliberately avoided such an interpretation of the statute:

> "The statute imposes upon the courts the duty of finding, upon the evidence adduced, whether a strike or lockout meets the statutory conditions of breadth of involvement and peril to the national health of safety. \* \* \* The parties dispute the meaning of the statutory term 'national health'; the Government insists that the term comprehends the country's general well being, its *economic health*; petitioner urges that simply the physical health of the citizenry is meant. *We need not resolve this question, for we think the judgment below is amply supported on the ground that the strike imperils the national safety.* Here we rely upon the evidence of the strike's effect on specific defense projects; we need not pass on the Government's contention that 'national safety' in this context should be given a broader construction and application. [Emphasis added.]"

■ The "national safety" involved in that case was the effect of a nationwide steel strike on a multitude of defense projects given the critical nature of the steel industry. Given the "industry-wide" strike requirement of § 178 and the degree of economic effect that a strike of that breadth is bound to have, there are admittedly a good many cases that include some language as to economics. Yet the Government has failed to cite even one case despite our many requests—and this Court has been unable to find any such instance—where an injunction under § 178 was granted where injury to the national defense or the war effort was not an important if not crucial element of the irreparable harm alleged. The then Senator John F. Kennedy during discussions of these emergency provisions recognized that too broad an interpretation of Governmental power might lead to the same abuses that the Norris-LaGuardia Act had attempted to cure. He said:

> "The proposal embraces two separate things, health and safety. Because the remedy is drastic these two, in my opinion, are sufficient. I believe we should apply this remedy when the strike affects health or safety, but not the welfare and interest, which *may mean anything.* I would not interfere in an automobile strike because while perhaps that affects national interest, it does not affect health and safety." 93 Congressional Record 3513.

We agree with Senator Kennedy's remarks. Given the complete absence of any decision that has granted an injunction based solely on national economic interest without considerations of national defense or physical health, we cannot permit an interpretation of § 178 that would include economic injury as a controlling part of the "national health or safety". The Government in the present case has not made any reference to the national defense as indeed it cannot. Corn and soybeans are not airplane parts or missile components and grain elevators are not steel mills or railroads. Thus, the Government is precluded from invoking part (a) (ii) of § 178 since "national health or safety" cannot be interpreted as fiscal health or national economic welfare and it is foreclosed from picturing this strike as a defense threat to the "national safety" by the complete lack of any defense or war effort considerations.

■ Even assuming arguendo that the economic injury complained of is statutorily sufficient under § 178, we believe that the Government has not proven that injury exists in the proportions and to the extent that it has alleged. If the strike was to continue until December 15, the end of the Great Lakes shipping period, the evidence indicates that about 35 million bushels of corn and soybeans, the commodities involved in this strike, will be denied access to the grain elevators on strike. The Government contends that

these 35 million bushels will bog down somewhere along the pre-shipment route and will thus fail to reach foreign markets resulting in dumping by farmers, injury to the balance of trade deficit and harm to the national and international grain pricing mechanism. Local 418 refutes these charges by illustrating that a substantial portion of the 35 million bushels in question can be shipped from alternate points, albeit at a higher price given the somewhat greater distances involved, and that consequently this grain will ultimately reach its foreign destination eliminating any harm to the balance of trade and alleviating farmer dumping.

In regard to alternate points, testimony revealed that the Cargill elevator is the largest grain elevator in Chicago— is not on strike—and could thus absorb some of the grain that would normally reach the struck elevators between now and December 15. In addition, the ports of Milwaukee, Duluth, Toledo, the Texas Gulf ports and the New Orleans port now open pursuant to an injunction, all accommodate ocean going vessels and have grain elevator facilities providing yet another large outlet for the 35 million bushels of Midwestern corn and soybeans.

The Government attempts to refute the alternate point argument by citing *Steelworkers* to the proposition that the United States need not look to other portions of an industry to obtain relief that it needs. The Government, it is argued, can therefore ignore the fact that the ports of Toledo, Milwaukee, etc. might be able to handle the grain in question and need only consider the Chicago strike in isolation.

In *Steelworkers* the Union contended that "somewhat in excess of 15% of the steel industry remained unaffected by the stoppage, and that only 1% of the gross steel product is ordinarily allocated to defense production" 361 U.S. at 47, 80 S.Ct. at 179. The Union therefore argued that the national safety was not imperiled since all defense steel could come from a small percentage of the nation's steel mills and, consequently, the

entire industry should not have been enjoined because of the minute percentage which was defense related. The Supreme Court held that:

"A court is not qualified to devise schemes for the conduct of an industry so as to assure the securing of necessary defense materials. It is not competent to sit in judgment on the existing distribution of factors in the conduct of an integrated industry to ascertain whether it can be segmented with a view to its reorganization for the supply exclusively, or even primarily, of government-needed materials. Nor is it able to readjust or adequately to reweigh the forces of economic competition within the industry or to appraise the relevance of such forces in carrying out a defense program for the Government."

On these same grounds the Government would have us ignore the alternate points available. There is, however, absolutely no basis of comparison between this case and *Steelworkers*. The Supreme Court, in *Steelworkers* indicated at great length that steel was an integrated industry making it virtually impossible to separate needed from unneeded items and that it would be too burdensome if not impossible for a District Court to choose which facilities to open or reorganize for defense needs given the multitude of considerations involved and the vast number of items involved.

Quite unlike that case, the industry in our case does not deal with numerous defense projects but rather with two distinct fungible commodities; the grain industry is not at all similar to the integrated production of the steel industry and can be segmented; and most importantly the burden will not be upon this Court, once the injunction is denied, to select those alternate points of shipment for the grain involved. Rather this Court's involvement will terminate upon the denial of injunction and the grain market itself will perforce have to readjust by itself to reflect the unavailability of Chicago facilities and shippers will of necessity gravitate to alternate port

facilities without further burden upon this Court. Thus, *Steelworkers* has no bearing in this regard on our case.

We therefore can and must consider the availability of other ports and based on that availability we find that the injury falls far short of that which the Government has alleged and, consequently, even if we were to permit § 178 to apply to a national economic emergency we simply do not find such an emergency to exist.

Granted that the greater distance involved in alternate point shipment has a bearing on the grain price mechanism yet this has very little effect on the balance of trade deficit and impairment of the national might that the Government has alleged.

We are willing to go even one step further and concede for argument's sake that there is no substantial alternate method of shipment and that there is therefore injury to some extent to the national economy. We would nevertheless be compelled to deny this injunction given the remoteness and minimal effect accounted for by Local 418's strike.

Some harm or threat of injury is regretably a natural indispensable element of any strike; however, it is the very essence of the only weapon labor can aim at management. But such injury remains a question of degree. The closing of a small factory somewhere in the United States, due to the striking of ten employees may injure the economy, if we stretch the meaning of injury to absurd proportions, by decreasing the Gross National Product by $25,000 and might add to the balance of trade deficit by that same amount. Yet, no one would venture that this is an injury of such consequential dimensions as to necessitate governmental intervention. On the other hand, the fact that only two—or two hundred—workers are on strike is not of itself dispositive of whether a strike is critical or not. A qualitative as well as quantitative approach must be taken; it is not how many do it but rather what they do. If two men manufacture the firing pins for all of this country's rifles, quite obviously their refusal to work is of enormous significance despite their insignificant number. This, in fact, is the basis for enjoining strikes even in small segments of the defense industry. Local 418, however, with its two hundred men, simply does not fall into either the qualitative or quantitative categories that traditionally allow for § 178 powers. They are not involved in any defense projects, by any stretch of the imagination, and the injury that results from their strike is relatively remote and minimal. As the Findings of Fact indicate this strike involves .0009% of this Country's maritime workers and .0036% of all longshoremen in the United States. The Port of Chicago ranks Fifteenth among all United States ports in total volume of exports handling approximately 1.75% of all U.S. exports. The total volume of all exports of soybeans and corn, the commodities affected by this strike, represents about 2.8% and 1.9%, respectively, of the dollar value of all United States exports. The entire Port of Chicago accounts for approximately 10% of United States shipments of corn and 9% of soybeans or under one-half of 1% of all U.S. exports annually. About 3.8% (35,000,000 bushels) of the total 900 million bushels that are shipped from the United States will be affected if Local 418 stays out until December 15, the end of the shipping season. The monetary value of the corn and soybeans affected is about $75 million, all U.S. exports amounted in 1970 to about $43,226,000,000 and the 1970 balance of trade deficit was about $3,589,000,000.

Thus it seems fairly evident that the effect of the Local 418's strike on the total economic picture is not very substantial. Though admittedly it is not so minute as in the example of the small factory mentioned earlier, still, it is not an injury of such proportions that would compel governmental intervention into a local strike. The Government also argues that aside from the balance of trade and export harm, farmers are being forced to dump grain for lack of storage or shipping facilities and that the grain

pricing mechanism has been adversely affected. These injuries likewise, regretable as they are, (and this Court is certainly sympathetic to the farmer's problem) are not consequential injuries in a labor injunction context. The major cause for the dumping is the stipulated fact that farmers have produced a bumper crop whose surplusage would to some extent result in dumping even absent Local 418's strike. This dumping may be alleviated once this injunction is denied, given the fact that farmers will realize that they must seek alternate routes.

The contention that the grain pricing system is impaired, while somewhat speculative given the fact that the bumper crop itself has disrupted that system, is far removed from the genre of harm that Federal Courts will enjoin. It is doubtful that the strike, should it last until December 15, will cause the destruction to the pricing mechanism that the Government alleges and no doubt the denial of this injunction will cause alternate methods of shipment which will be reflected in a new or adjusted pricing system.

Thus, we have demonstrated that Local 418's strike is not within § 178(a) (ii); that no substantial injury is involved and that the injury that might result is too remote to invoke this Court's jurisdiction.

Finally, the circumstances here do not meet the "industry-wide" requirements of § 178(a) (i). By all indications Local 418's strike involves a minute portion of the Maritime industry. Nor is the grain elevator industry substantially affected given the small fraction of the total corn and soybean export that the struck elevators account for and the availability of numerous other ports for shipment.

What emerges from this confrontation once the smoke has cleared is that a small local's strike has somehow been swept up in a wave of litigation that was aimed at giants under a statute that never was intended to apply to a work stoppage of such a limited nature. Facts adequately indicate how totally unrelated and un-associated the grain elevator strike is to the various other longshoremen strikes that are now or were recently in progress. One need only juxtapose the Chicago strike with the Pacific Coast strike to see the gross incongruity between the two. The West Coast strike had been going on for several months, involving 15,000 longshoremen, a multitude of companies and closing every port facility from Mexico to Juneau, Alaska, before the Chicago strike involving two hundred men began on September 1. The Chicago union is not the same union as was on strike on the Pacific Coast and the labor issues here are totally unrelated to those involved in the West or the East. The Port of Chicago as such is not and has not been on strike. All longshoremen activities have proceeded uninterrupted save for Local 418's strike, quite unlike the *total* work stoppage in the West. On October 1 the East Coast longshoremen went out on strike and suddenly Local 418 was both geographically and legally in the center of a strike it had absolutely no relationship to and found itself as a defendant in a suit simply because it too had "Longshoremen" in its name. It seems that the Government was in error to include Local 418 in its national litigation and now that the Pacific Coast and New Orleans strikes have been enjoined, Local 418 ought to be allowed to pursue its negotiations in the undisturbed manner that preceded its misplaced notoriety.

One last point must be cleared up that touches upon the discretion this Court has in finding as it did. Counsel for the Government quoting from *Steelworkers* has repeatedly stressed throughout the hearings that the President, his Board of Inquiry and the Attorney General in instituting this suit, have already determined that this strike is of national emergency proportions thus intimating that we have very little choice but to grant the injunction. The Supreme Court in *Steelworkers* said:

"It is not for the judiciary to canvass the competence of officers of cabinet rank, with responsibility only below

that of the President for the matters to which they speak under oath, to express the opinions set forth in these affidavits. Findings based directly upon them surely cannot be said to be 'clearly erroneous.' Fed.Rules Civ. Proc., 52(a).

"Moreover, under § 208 the trier of these facts was called upon to make a judgment already twice made by the President of the United States: once when he convened the Board of Inquiry; and once when he directed the Attorney General to commence this action. His reasoned judgment was presumably based upon the facts we have summarized, and it is not for us to set aside findings consistent with them. The President's judgment is not controlling; § 208 makes it the court's duty to 'find' the requisite jurisdictional fact for itself. But in the discharge of its duty a District Court would disregard reason not to give due weight to determinations previously made by the President, who is, after all, the ultimate constitutional executive repository for assuring the safety of the Nation, and upon whose judgment the invocation of the emergency provisions depends." 361 U.S. at 48, 80 S.Ct. at 179.

Our determinations would indeed be superfluous and this Court would merely be a rubber stamp if it was irrevocably bound by the Factual Findings of the President and his various Cabinet members. This Court believes that it has properly fulfilled its duty in searching for the "requisite jurisdictional fact for itself" and that it has not disregarded reason in the weight given the judgment previously made by the President. If we were the trier of fact in the Pacific Coast strike we would admittedly be far more constricted by the prior findings given the enormity of that work stoppage and the vast amount of space given to that strike by the Board of Inquiry and in all of the affidavits filed. Likewise, if we were the court sitting in the Steelworkers' strike our path would be narrow and quite obvious.

But this case is not a steel strike or an enormous coastal strike. We have given the various affidavits and findings from Washington the weight they deserve and find them of little relevance in deciding *this* case affecting the Chicago Area. The affidavits in this case were not stipulated to as they were in the *Steelworkers* case; thus, they do not carry the same evidentiary weight.

Furthermore, the vast majority of affidavits, the President's Executive Order and the many papers filed to set the injunction procedure in motion, including the Board of Inquiry Findings are overwhelmingly concerned with the West Coast strike and little reference is made to the Chicago strike. The only affidavit among many that mentions or shows any knowledge of the Chicago strike is that of Clarence D. Palmby, Assistant Secretary of Agriculture.

Even the President's Board of Inquiry failed to invite Local 418 to appear before it reflecting on the degree of "inquiry" that was involved in regard to the Chicago strike. Thus the perfunctory manner in which the Chicago strike was treated indicates a prior judgment far less reasoned than that which bound the court in *Steelworkers*, and it seems that the decision to enjoin the Chicago strike is a mere appendage to the West Coast litigation.

The District Court obviously has no discretion to counteract Congress' intentions under the statute once it has made the determination that a national emergency exists. It cannot say that no injunction should issue in the face of a national emergency; it cannot issue a 40-day or a 90-day injunction. But this Court most certainly has the discretion to find for itself that the jurisdictional fact necessary to invoke § 178 does not exist. (See *Steelworkers* pp. 56–58, 80 S.Ct. 1, 4 L.Ed.2d 12)

Having found that the strike by Local 418 does not imperil the national health or safety and that the strike is not of an industry-wide nature we deny the motion for an injunction and vacate the Temporary Restraining Order.