**UNITED STATES of America,**
**Plaintiff,**

v.

**PACIFIC MARITIME ASSOCIATION, 550 California Street, Sacramento Street Tower, San Francisco, California, 94104,**

and

**International Longshore and Warehouse Union, 1188 Franklin Street, San Francisco, California, 94109, Defendants.**

**No. C 02–04859 WHA.**

United States District Court,
N.D. California.

Oct. 16, 2002.

Arthur R. Goldberg, Mark T. Quinlivan, U.S. Dept. of Justice, Civil Division, Washington, DC, for plaintiff.

## ORDER APPROVING STIPULATED PRELIMINARY INJUNCTION

ALSUP, District Judge.

### INTRODUCTION

In this action for injunctive relief under the emergency provisions of the Labor Management Relations Act of 1947, commonly known as the Taft–Hartley Act, this order **APPROVES** the stipulation of the parties imposing injunctive relief.

### STATEMENT

At the direction of President George W. Bush, the United States commenced this action for injunctive relief on October 8, 2002, under the emergency provisions of the Labor Management Relations Act of 1947, 29 U.S.C. 176–180. The President invoked the Act to interrupt a lockout by the Pacific Maritime Association and its members affecting 29 ports on the West Coast and 10,500 longshore workers represented by the International Longshore and Warehouse Union. The lockout began on September 27, following a breakdown in negotiations over a new collective-bargaining agreement, the old one having expired over the summer.

Prior to suit, on October 7, the President appointed a board of inquiry pursuant

to Section 206 after finding that (1) the lockout affected a substantial part of the maritime industry and (2) the lockout, if permitted to continue, would imperil national health and safety. Exec. Order No. 13275, 67 Fed.Reg. 62,869 (Oct. 7, 2002). The board of inquiry issued its report on October 8. The board concluded that the PMA and the ILWU would not resolve the port shutdown within a reasonable time. After receiving the report, the President directed the Attorney General to initiate this action.

A few hours after commencement of this action on October 8, a hearing was conducted on the government's motion for a temporary restraining order. All parties were present and represented by counsel. After all parties were heard, the Court found that the statutory preconditions for injunctive relief were satisfied and granted the temporary restraining order requested by the United States. A further hearing was set to determine whether to convert the restraining order into a preliminary injunction. Rather than file any opposition to the preliminary-injunction request, however, defendants soon entered into a stipulation with the United States. Specifically, the parties requested that the temporary restraining order be converted to a preliminary injunction to remain effective until dissolved pursuant to Sections 209–210, reserving appeal rights. This order **APPROVES** the stipulation for the reasons set forth below.

## ANALYSIS

Section 208 of the Taft–Hartley Act provides:

Upon receiving a report from a board of inquiry the President may direct the Attorney General to petition any district court of the United States having jurisdiction of the parties to enjoin such strike or lockout or the continuing thereof, and if the court finds that such threatened or actual strike or lockout –

(i) affects an entire industry or a substantial part thereof engaged in trade, commerce, transportation, transmission, or communication among the several States or with foreign nations, or engaged in the production of goods for commerce; and

(ii) if permitted to occur or to continue, will imperil the national health or safety, it shall have jurisdiction to enjoin any such strike or lockout, or the continuing thereof, and to make such other orders as may be appropriate.

29 U.S.C. 178(a). For the reasons stated at the hearing on October 8 and elaborated herein, this order finds that both statutory factors have been met.

With respect to the first statutory factor, the lockout at 29 ports along the West Coast and resultant work stoppage have affected a substantial part of the nation's maritime industry, an industry intimately engaged in "trade, commerce, transportation, transmission, or communication among the several States or with foreign nations." 29 U.S.C. 178(a)(i). Specifically, the 29 affected West Coast ports are crucial gateways to America's trade routes to Asia and the Pacific (Mineta Decl. ¶ 9).[1] Indeed, the affected ports annually handle over 50 percent of the nation's containerized imports and exports, with a total annual value of bulk cargo at $300 billion (id. at ¶¶ 9, 11). Secretary of Transportation

---

1. As of October 6, the Maritime Administration and the U.S. Coast Guard reported that 239 idled cargo vessels were berthed or anchored at the 29 affected ports. An additional 107 cargo vessels were scheduled to arrive at these ports by October 9. Based on the average vessel tonnage moved in 2001, those ships were carrying more than 1.7 million metric tons of imports. That cargo could not be unloaded at the affected ports. Another 1.2 million metric tons of exports also were waiting for loading (Mineta Decl. ¶ 14).

Norman Y. Mineta explains in his declaration (*id.* at ¶¶ 11, 16, 22):

> West Coast ports handle more than half of the Nation's containerized imports and exports. During 2001, West Coast ports handled around 9.3 million twenty-foot equivalent units (TEUs—a standardized industry measurement) of containerized cargo, or over half of the TEUs handled by all U.S. ports. The daily average volume of these West Coast ports was over 25,000 TEUs.
>
>    \*    \*    \*    \*    \*    \*
>
> With the passage of each week of the Port Shutdown, over 1.5 million metric tons of exports, nearly 2 million tons of imports, and more than 600 thousand tons of domestic trade that supply the lifeblood of the U.S. economy are left waiting at dockside and idle aboard ships. In the U.S. foreign trade alone, the value of trade halted each week totals around $6 billion.
>
>    \*    \*    \*    \*    \*    \*
>
> West Coast ports serve as major gateways for domestic, export, and import shipments. Incoming cargo handled at West Coast ports is generally distributed on a nationwide basis, and an interruption in the handling of that cargo would clearly have impacts far beyond the ports and port areas. More than 50 percent of all goods shipped to West Coast ports are eventually delivered to destinations east of the Mississippi.

Additionally, Secretary of Commerce Donald L. Evans concurs with Secretary Mineta's considered assessment of the critical importance of the 29 affected West Coast ports to the nation's maritime industry. Secretary Evans states (Decl. ¶ 4):

> The operations of all seaports on the West Coast of the United States have been halted by the work stoppage. The West Coast seaports are a critical link in the nation's transportation system and economic infrastructure, particularly with respect to U.S. imports and exports. The West Coast seaports affected by the work stoppage handle a significant portion of U.S. trade. In 2001, about 21 percent of all U.S. merchandise imports (worth $238 billion) and nearly 9 percent of all U.S. merchandise exports (worth $58 billion) moved through the West Coasts seaports.

Without question, the first statutory factor is met. The PMA – which represents eighty shipping lines and the port operators along the West Coast – does not dispute this. Nor does the ILWU, which represents 10,500 longshore workers. Accordingly, this order reiterates the finding that the shutdown of 29 West Coast ports and resultant work stoppage have affected a substantial part of the maritime industry, an industry engaged in "trade, commerce, transportation, transmission, or communication among the several States or with foreign nations." 29 U.S.C. 178(a)(i). Although it is unnecessary to pause further over the first statutory factor, it can safely be added that other industries, including agricultural, transportation and manufacturing, have clearly been affected by the widespread inability of farm producers to export perishables, of trucking and railway concerns to receive and send containers, and of industrial plants to obtain critical parts for assembly lines (Veneman Decl. ¶¶ 3–5, 10–11; Mineta Decl. ¶¶ 17–18, 25–27; Evans Decl. ¶¶ 5, 7–8).

The second statutory factor is met as well. The lockout and resultant work stoppage "if permitted to occur or to continue, will imperil the national health or safety." 29 U.S.C. 178(a)(ii). This order reiterates the finding made in open court on October 8 that both national health *and* national safety will be imperiled by the lockout's continuation. A continuation of the closure of West Coast ports will endanger the national economy and labor force.

Key industries directly and substantially affected, as stated, include the transportation and agricultural industries. Continuation of the closure would harm the national economy still recovering from recession. *See United States v. Int'l Longshoremen's Ass'n*, 1971 WL 2992, at *3 (7th Cir. Nov.5, 1971) (Stevens, J.) (holding that "national health" includes "more than the physical well-being of its citizenry. It necessarily encompasses its own life blood or, in other words, the essential well-being of the economy"). Secretary Evans, in addressing the state of the national economy, observes in his declaration (Decl.¶¶ 13, 12):

> The work stoppage comes at a critical time for the U.S. economic recovery. It is occurring during a critical inventory-building season when retailers are stocking for the end-of-year holidays … Although the economy has started a recovery from last year's recession, considerable uncertainty persists about the strength of overall economic growth in the coming months.
>
> \*     \*     \*     \*     \*     \*
>
> If the work stoppage is permitted to continue for an extended period, it would have a significant negative effect on the U.S. economic recovery and would lead to a decline in the rate of growth of real GDP.

In particular, Secretary Evans explains (Decl.¶ 5):

> Industries accounting for the largest dollar volume of imports through the major West Coast seaports in 2001 were automatic processing machines and telecommunications equipment ($54 billion), and motor vehicles and transportation equipment ($36 billion) – 24 percent and 20 percent, respectively, of all U.S. imports of these commodities. These imports are important to U.S. consumers and to domestic industries that represent a significant portion of the U.S. economy. For example, in 2001, imports of motor vehicles supplied 39 percent of apparent U.S. consumption of autos. Imports of other commodities through the major West Coast seaports are important inputs to U.S. industrial production, including motor vehicle parts ($6 billion), parts for office machines and automatic data processing machines ($5 billion), and internal combustion engines ($2 billion). These imports support production in U.S. industries that together account for $422 billion or about 4 percent of U.S. Gross Domestic Product ("GDP") and 2.4 million U.S. jobs.

Relatedly, the lockout, if continued, will harm the nation's labor force. Secretary of Labor Elaine L. Chao emphasizes (Decl.¶¶ 6–7):

> The shutdown of the West Coast ports has directly resulted in the unemployment of approximately 12,500 persons, including not only ILWU workers but also some management and support employees of the various port authorities. Direct losses of wages associated with these direct employment losses will be $85 million if the shutdown extends 20 days, for instance.
>
> A 20–day shutdown will cause ripple effects throughout the nation's economy, indirectly affecting employment in other industries dependent on West Coast shipping. Our analysis of the employment data indicates that as many as 634,000 jobs would be adversely impacted by a 20–day shutdown. More specifically, over the entire fourth quarter of 2002, employment on average will be reduced by approximately 140,000 jobs. Of this, approximately 23,000 jobs will be lost in transportation equipment sector, 21,000 in agriculture, 15,000 in industrial machinery and equipment, and 13,000 in electronic and other electrical equipment.

In our complex economy, where large industries must compete in a global marketplace and small businesses must continuously sustain sales to survive, a prolonged bottleneck in the vital transportation chain will critically disrupt the interdependence of domestic producers, retailers and consumers. The shutdown of 29 West Coast ports creates a substantial transportation bottleneck.

Key industries are directly and substantially harmed by the shutdown. Again, they include the transportation and agricultural industries. Within the transportation industry, both the trucking and railway sectors are adversely affected. Secretary Mineta describes the devastating effect were the lockout to continue (Decl.¶¶ 18, 17, 26):

> Virtually all containerized cargo moved to or from ports is moved by truck or rail. The cargo carried on a single 4,000–TEU containership requires 2,000–3,000 trucks to move the merchandise to destinations, or approximately ten 100–car freight trains.

\*    \*    \*    \*    \*    \*

Regarding the likely effects of a prolonged work stoppage on the trucking industry, we estimate that for every 14 days of the Port Shutdown, in excess of 88,000 individual one-way truck trips that would have otherwise entered or exited the affected ports would have been unable to do so ... However, the individual one-way estimate greatly understates the total effect that the current Port Shutdown has on the trucking industry. That is because, for the remaining 177,000 TEUs that would have entered or exited the affected ports via rail transportation during the same reporting period, nearly all of those containers would have spent some or a significant part of their total transportation time on a truck. Accordingly, measured against merely the first 14 days of the Port Shutdown, we estimate that in excess of 350,000 containerized shipping units that would have otherwise spent some or all of their time being transported by truck, would have been unable to do so.

\*    \*    \*    \*    \*    \*

A 14–day Port Shutdown is estimated to cost the rail industry $177.4 million in lost revenues, or 0.52 percent of the industry's total annual revenues. In the short term, a substantial portion of the revenue could be regained by the rail industry as shipments would only be delayed. If the Port Shutdown term lengthens, however, an increasing portion of the revenues would be permanently lost to the rail industry. The rail industry also stands to lose revenues from the reduction of outbound movements of finished goods from industries that receive inbound containers.

As a result, Secretary Mineta now warns (Decl.¶ 24):

> Viewed from another perspective, the Department estimates that, 14 days into a Port Shutdown, more than $12 billion in goods and services that would otherwise have found its way into the U.S. economy from the West Coast ports could not do so. Moreover, due to the perishable, seasonal or otherwise time-sensitive nature of many such goods, a significant percentage of those otherwise delayed deliveries represent sales that will either never be made, or made at heavily discounted prices ... Overall, the value of goods affected after 20 days is projected to exceed $17 billion, rising to $25 billion at 30 days and $37 billion at 45 days. As large as these numbers are, it is important to emphasize that the foregoing estimates understate the total impact of a continued Port Shutdown.

In the agricultural industry, production from about one acre out of every three moves to export markets. Perishable commodities, once lost, are sold without salvage. Secretary of Agriculture Ann M. Veneman describes the ongoing impact of the shutdown (Decl.¶¶ 3–5, 11):

> U.S. agriculture is very dependent economically on international trade with annual exports equal to about 25 percent of the value of production. For crops, the production from about one acre out of every three moves to export markets. About one-half of all U.S. agricultural exports move through West Coast ports. The major immediate effect is being felt in container trade moving through these ports. Containers are used to ship high-value and perishable agricultural commodities. West Coast ports handled 58 percent of all containerized agricultural exports from the United States during 2001 ...
>
> Containers generally carry time-sensitive, perishable commodities, such as fruit, vegetables, poultry, fish, and meat. Shippers contacted by the USDA have already raised concerns that containers left in yards during the West Coast port closure are suffering general deterioration of product quality. For produce, this is especially serious, because once the product deteriorates, its value is driven to zero and the product is essentially sold at no salvage value. Ultimately, growers and grower-shippers bear the costs of lost or lower quality product.
>
> \*   \*   \*   \*   \*   \*
>
> Altogether, approximately $2 billion of containerized high-value agricultural exports and an average of nearly 1.2 million metric tons of lower-valued bulk agricultural shipments worth more than $250 million move through West Coast ports each month during October–December. That is equivalent to nearly 50 percent of U.S. agricultural exports, on a monthly average basis, moving through West Coast ports. The West Coast port closure means an export loss of $500 million per week in agricultural commodities.

The government's evidence stands uncontradicted. In light of the above, this order finds that the shutdown of 29 West Coast ports and resultant work stoppage, if permitted to continue, will imperil the national health. 29 U.S.C. 178(a)(ii).

Separate and apart from national health, this order further finds that the lockout's continuation will imperil national safety. Specifically, the lockout disrupts the transport of essential military cargo and jeopardizes one of the Department of Defense's core missions – equipping and sustaining the military at a time when it is prosecuting a global war on terrorism. Secretary of Defense Donald H. Rumsfeld states (Decl.¶ 3):

> DoD relies on commercial ships in common carrier service operating from commercial terminals to carry most of its sustaining dry cargo exports such as foodstuffs, clothing and protective gear, medical supplies, construction materials, and munitions necessary for the support of the armed forces. Moreover, DoD increasingly has reduced its inventory levels of materials, relying instead on the commercial practices of "just-in-time" deliveries and direct vendor shipments as the most efficient means to conduct business. Consequently, DoD depends heavily upon the commercial transportation industry. Since the work stoppage began, I am advised that many ships have become immobilized because commercial cargo has not been loaded or unloaded, thus making them unavailable for military cargo. This disrupts the flow of essential military cargo and jeopardizes one of DoD's core functions:

that of equipping and sustaining our armed forces during this time of war. I understand that some important military cargo has been stranded in commercial ships and in commercial ports. The Department of Defense already has had to implement costly temporary measures to bypass the commercial system to ensure the delivery of this military cargo, insofar as it can be identified as such. Furthermore, the congestion at the ports could impede the planned use of dedicated terminals for loading combat and combat support units and their equipment.

The provisional agreement between the PMA and the ILWU to handle essential military cargo during the lockout is and will be inadequate to meet the needs of the Department of Defense. Significantly, the various commercial supplies upon which the Department of Defense increasingly relies are not identified at shipment time as military cargo. It is improbable that defendants could identify, segregate and handle essential nondescript defense cargo on large container ships. Secretary Rumsfeld explains (Decl.¶ 4):

> Commercial items generally are not identified at the time of shipment as military cargo or as destined for use by the military. Raw materials, medical supplies, replacement parts, and components as well as everyday subsistence needs of our armed forces are just some of the essential military cargo provided by commercial contractors that typically are not labeled as military cargo. Additionally, items identified as military cargo often represent a small fraction of the cargo that typically is loaded on the large container ships that have become the industry standard. I am advised that it would be impractical and thus unlikely that the ILWU and the PMA could identify, segregate, and handle essential military cargo on multiple large container ships. As a result, it may be

difficult for the ILWU and the PMA to implement fully their commitment to handle essential military cargo.

Moreover, the unpredictable need for immediate and sufficient ocean-shipping capacity to transport essential military supplies is critical to national safety. Secretary Rumsfeld warns (Decl.¶ 4):

> In addition, sudden, unforeseen developments in world events may at any time demand that additional ocean shipping capacity be made immediately available for military needs. The cumulative effect of delays, or lack of sufficient shipping capacity when needed, would adversely affect our ability to deliver military cargo to overseas destinations as required, and jeopardize the defense effort and the Global War on Terrorism.

The shutdown adversely affects ocean-shipping capacity because over one-third of the commercial ships committed to transporting military supplies during a national emergency operate on transpacific routes using West Coast ports. Secretary Mineta explains this sealift aspect of our merchant fleet (Decl.¶ 28):

> Over 35 percent of the ships in the U.S.-flag militarily useful fleet of merchant vessels operate on the transpacific routes using West Coast ports. These ships, which participate in the Maritime Security Program and the Voluntary Intermodal Sealift Agreement, are committed to provide assured access to the Department of Defense for the movement of military sealift in a national emergency. U.S.-flag liner ships have an average daily operating cost of around $40,000. These ships have sustained a cumulative loss of approximately $54 million per week during the first week of the Port Shutdown.

In short, at a time when our nation is at war with international terrorists and when

our national defense system must be fully prepared, the sustained closure of West Coast ports would imperil the national safety.[2] 29 U.S.C. 178(a)(ii).

\* \* \* \* \* \*

At the October 8 hearing, the ILWU raised two points. It first argued that the invocation of the Taft–Hartley Act was the product of "collusion" between the United States and the PMA. This was rejected as speculation and, at all events, beside the point, since all persons, including both the PMA and the ILWU, have the right to petition the government for redress of grievance. The focus must be on whether the government has proven the statutory preconditions for emergency relief – not on the politics behind its decision to seek relief. The ILWU's second argument was that the lockout was on the verge of collapsing and, thus, there was no need for injunctive relief. This was rejected on the facts given the government's powerful showing of the massive logjam of imports and exports paralyzing the West Coast. Even if the lockout eventually might have collapsed of its own weight, estimating when a voluntary end to the shutdown might have come would have been guesswork. Again, the statutory findings are plainly indicated. That is the end of the inquiry at the district court. *United Steel Workers of America v. United States,* 361 U.S. 39, 41, 80 S.Ct. 1, 4 L.Ed.2d 12 (1959).

Although not raised by the parties, the Court has considered on its own whether a Taft–Hartley injunction provoked by a management lockout, as here, can be directed not only at the lockout but also at any future strike or other work slow-down by a union. This case is evidently the first to arise primarily from a lockout. This order concludes that in such circumstances the injunction may extend beyond enjoining a lockout and also may enjoin a strike, including a work slow-down. The Act expressly refers to a "threatened ... strike" as a basis for an injunction. "The term 'strike' includes ... any concerted slow-down or other concerted interruption of operations by employees." 29 U.S.C. 142(2). The findings of the board of inquiry demonstrate that the lockout was, at least in part, occasioned by work slow-downs in various ports. In this charged environment, it is clear that a "strike" is "threatened" within the meaning of the Act. Although the massive gridlock at West Coast ports is primarily attributable to the PMA's lockout, and although the lockout will now be enjoined, concerted slow-downs by longshore workers would greatly exacerbate an existing national emergency. Therefore, there is a sufficient basis to extend the injunction to prohibit both lockouts and strikes at this juncture.

Moreover, in the past Taft–Hartley decisions generated by strikes, the preliminary injunctions swept broadly to prohibit both strikes and lockouts, at least insofar as can be determined from the published deci-

---

2. No evidentiary objection has been made to any declaration submitted by the United States. Although ordinary percipient witnesses could not testify to sweeping opinions based on hearsay, these declarants are entitled to do so as experts under Federal Rule of Evidence 702. The declarants, all Cabinet-level officers, are qualified by their respective positions, experience and training to draw the very type of conclusions presented here based upon the very type of out-of-court materials described. Each Secretary's experienced

judgment and considered assessment in his or her area of expertise is entitled to substantial deference. *United Steel Workers of America v. United States,* 361 U.S. 39, 48, 80 S.Ct. 1, 4 L.Ed.2d 12 (1959) (Frankfurter and Harlan, J.J., concurring) ("It is not for the judiciary to canvass the competence of officers of Cabinet rank, with responsibility only below that of the President for the matters to which they speak under oath, to express opinions set forth in these affidavits").

sions. At all events, under Section 208 of the Act, the Court has the authority "to make such other orders as may be appropriate." 29 U.S.C. 178(a)(ii). The Court may issue such ancillary orders as long as the provisions terminate upon the statutory dissolution of the injunction. *Seafarers Int'l Union v. United States,* 304 F.2d 437, 443 (9th Cir.1962). A prohibition on strikes would plainly qualify under this authority.

### CONCLUSION

For the reasons stated, this order **APPROVES** the stipulated preliminary injunction.

**IT IS SO ORDERED.**